UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
                                                          :
INNOVATIVE CUSTOM BRANDS INTL., INC.          :        Civil Action No.
                                                          :        04 CV 2937 (RH)
                                                          :        ECF CASE
                      Plaintiff,                          :
                                                          :
          -against-                                       :        **COMPLAINT**
                                                          :
                                                          :
SOLE CITY, INC., SOLOMON SAFDEYE,             :        **PLAINTIFF DEMANDS**
ALAN KANDALL, JEFFREY BERNSTEIN and           :        **TRIAL BY JURY**
MARC DOLCE                                                :
                                                          :
                      Defendants.                         :
------------------------------------------------------------------------x

         Plaintiff Innovative Custom Brands Intl., Inc. ("ICB US"), by its attorneys Gursky &

Partners, LLP, for its Complaint against Defendants Sole City, Inc. ("Sole City"), Solomon

Safdeye ("Safdeye"), Alan Kandall ("Kandall"), Jeffrey Bernstein ("Bernstein") and Mark Dolce

("Dolce"), alleges on knowledge as to its own acts and otherwise on information and belief as

follows:

<u>**NATURE OF THE ACTION**</u>

         1.        In this action, Plaintiff asserts claims for trademark infringement, false

designation of origin and false advertising under the Lanham Act, 15 U.S.C. § 1051 <u>et seq.</u> (the

"Lanham Act"), common law trademark infringement, breaches of contract, fraud, negligent

misrepresentation and unjust enrichment in violation of, and pursuant to, the laws of the State of

New York.  Plaintiff's claims arise out of Defendants' wrongful conduct in (i) violating

Plaintiff's federal and common law trademark rights; (ii) numerous breaches of two agreements;

and (iii) making material misrepresentations to Plaintiff which were intended to, and did, induce

Plaintiff to forestall action to collect monies owed to it and to support a business arrangement between Sole City and a third party.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this matter pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1338 and 1367.  Plaintiff's claims are predicated upon the Lanham Act, and the common law of the State of New York.

3.      Venue is properly founded in this district pursuant to 28 U.S.C. §§ 1391 (b) and (c).

## THE PARTIES

4.      Plaintiff ICB US is a Texas corporation with its principal place of business at 1350 Broadway, New York, NY 10018.  ICB US designs, manufactures and sells footwear bearing various trademarks owned by third parties, including footwear bearing numerous internationally recognized brands.  In addition, ICB US owns the word mark TROOP and various stylized marks incorporating the TROOP mark.

5.      Defendant Sole City is a Delaware corporation with its principal place of business at 141 West 36th Street, New York, NY 10018.  Sole City is engaged in the business of manufacturing and selling branded footwear to national and regional retailers throughout the United States and Canada.

6.      Defendant Safdeye is an individual domiciled in the State of New York, whose business address is 141 West 36th Street, New York, NY 10018.  Safdeye is President and sole shareholder of Defendant Sole City and dominates and controls all of Sole City's business activities, including the business activities hereinafter alleged.  Safdeye personally participated in the wrongful acts alleged herein.

2

7.     Defendant Kandall is an individual domiciled in the State of New York, whose business address is 141 West 36th Street, New York, NY 10018.  Kandall is the Chief Financial Officer of Sole City and personally participated in the wrongful acts alleged herein.

8.     Defendant Bernstein is an individual domiciled in the State of New York, whose business address is 141 West 36th Street, New York, NY 10018.  Bernstein is the Chief Operating Officer of Sole City and personally participated in the wrongful acts alleged herein.

9.     Defendant Dolce is an individual domiciled in the State of New York residing at 82 Halpin Avenue, Staten Island, NY 10312.  Dolce is a former employee of Sole City and personally participated in the wrongful acts alleged herein.

## BACKGROUND

10.     As noted above, ICB US designs, manufactures and sells footwear bearing various trademarks owned by third parties, including footwear bearing numerous internationally recognized brands.  In addition, ICB US owns the word mark TROOP and various stylized marks incorporating the TROOP mark (collectively the "TROOP Trademarks").  The TROOP Trademarks include Registered Trademark Nos. 2,022,078 and 1,534,395, and are valid, subsisting, and in full force and effect.  Registered Trademark No. 1,534,395 has achieved incontestable status pursuant to 15 U.S.C. § 1065.  ICB US and its predecessor trademark owners have been marketing products bearing the TROOP Trademarks since 1986.

11.     ICB US uses Full Creative, Ltd. d/b/a I.C.B. Asia, Co. Ltd. ("ICB Asia")(ICB US and ICB Asia are collectively referred to as "ICB"), as its exclusive manufacturing agent.

12.     Pursuant to a License Agreement dated, September 1, 2002 (the "TROOP License"), ICB US granted Sole City an exclusive right to market, sell, and distribute footwear bearing the TROOP Trademarks in the United States (the "Licensed Products").  Under the terms

of the TROOP License, Sole City, <u>inter alia</u>, (i) agreed to pay ICB US a royalty equal to the greater of 6% of actual net sales or certain specified minimum royalties; and (ii) was permitted to sell Licensed Products only to better quality retailers, and not to mass market or discount retailers.

13.     In addition, Sole City was obligated to purchase all Licensed Products from ICB US or its designee.  Consistent with ICB US's practice, ICB Asia was ICB US's designee to manufacture all Licensed Products pursuant to the TROOP License.

14.     In or about March 2003, Sole City began ordering Licensed Products from ICB Asia.  A Purchase Order and an Invoice was issued for each order shipped, and payment for the goods was due 90 days after shipment.

15.     Between March and December 2003, Sole City ordered and accepted delivery of approximately 110,000 pairs of Licensed Product having an invoice value in excess of $1,700,000.  To date, ICB Asia is owed approximately $1,300,000 for Licensed Products ordered and accepted by Sole City, plus more than $60,000 for sample and production molds ICB Asia manufactured at Defendants' behest.

## DEFENDANTS' WILLFUL TRADEMARK VIOLATIONS

16.     Sole City willfully infringed the TROOP Trademarks.  For example, Sole City was not licensed to use the TROOP Trademarks to sell or otherwise distribute products using the TROOP Trademarks to mass market retailers.  Without license or permission, Sole City nevertheless advertised, offered for sale and sold products to mass market retailers using the TROOP Trademarks.

17.     As more fully set forth below, Sole City repeatedly breached the TROOP License.  On March 24, 2004, ICB US terminated the License Agreement for cause.  Sole City

4

acknowledged the effectiveness of that termination on March 26, 2004. Notwithstanding that termination, Sole City continues to advertise, offer for sale and/or sell products using the TROOP Trademarks.

## MULTIPLE BREACHES OF THE TROOP LICENSE

18.     Sole City repeatedly breached the TROOP License. Sole City breached Paragraphs 3.1 and 3.3 of the TROOP License by failing to submit reports to Licensor 30 days after each calendar quarter which summarize the sales and shipments of Licensed Products and calculate sales royalties due on such sales. Rather, Sole City has submitted no reports since the inception of the TROOP License and has ignored written requests by ICB US for the sales information to enable ICB US to calculate the Sales Royalties due.

19.     Paragraph 3.1 also provides that the Sale Royalties calculated in the quarterly reports shall be paid to Licensor within 30 days after the close of each calendar quarter. Sole City has also breached Paragraph 3.1 and has never made a royalty payment since the License term commenced.

20.     Sole City is also in breach of Paragraph 2.7 of the TROOP License, which provides that Licensee may sell License Product only to better quality retailers, and may not sell any to mass market or discount retailers. To ensure compliance with this restriction, Paragraph 2.7 requires Licensee to submit to Licensor a list of all entities and retailers to whom it intends to sell or ship Licensed Products prior to each season for Licensor's review and approval. Sole City has never adhered to this procedure.

21.     This failure is hardly surprising given that Sole City has, in fact, sold  products using the TROOP Trademarks to mass market and/or discount retailers in direct contravention of Paragraph 2.7.

5

22.     Sole City additionally has breached Paragraph 5.3 of the TROOP License by failing to provide Licensor with information concerning Licensee's marketing, advertising, promotion, sales and distribution of Licensed Products as requested by Licensor, and by disseminating advertising and marketing materials without Licensor's prior approval.

23.     Accordingly, on March 24, 2004, Plaintiff terminated the TROOP License under Section 10.1, subsections (a), (e), and (f), based on the foregoing breaches, and because the Licensee and its agents knowingly made false and misleading statements intended to induce ICB US to forestall efforts to enforce the royalty and other provisions of the License.

## FRAUDULENT PROMISES TO PAY

24.     By late September 2003, Defendants had ordered and accepted delivery of Licensed Products having an invoice value of more than $800,000, but had only paid for a small portion of those goods.  Thus, in late September, ICB Asia began to make repeated requests of Defendants for payment of the outstanding invoices.

25.     On or about October 14, Randy Scurlock ('Scurlock'), an employee of ICB US, met with Kandall at Sole City's offices to discuss the outstanding invoices on ICB Asia's behalf. During the meeting, Scurlock expressed ICB Asia's concern that Defendants continued to order and accept delivery of quantities of Licensed Products from ICB Asia, but persistently failed to pay for the goods.

26.     Kandall falsely assured Scurlock that Sole City would pay what it owed, and told Scurlock that he was working with Sole City's bank to secure financing to pay ICB Asia's outstanding invoices.

27.     One week later, on or about October 21, during a business trip to Hong Kong, Safdeye spoke with ICB Asia's President Daniel Chen ('Chen') about the out standing amounts

Defendants owed ICB Asia.  During that conversation, Safdeye acknowledged Sole City's debt

to ICB Asia, and falsely promised Chen that Sole City would pay ICB Asia $200,000 on

November 15, 2003, and continue to pay $200,000 per month thereafter until the entire

outstanding balance was satisfied.  Chen told Safdeye that Sole City's failure to pay the past due

amounts in accordance with the parties' contract would have a significant adverse affect on ICB

Asia's cash flow.

28.     Relying on the representations made in October by Safdeye and Kandall that Sole

City was securing funding and would pay ICB Asia $200,000 per month until its debt was

satisfied, ICB Asia forestalled action to collect the debt owed it, and continued to ship goods to

Sole City.

29.     On or about November 6 or 7, Kandall falsely represented to the president of ICB

US, Mike Featherston ("Featherston"), and Dennis Ryan ("Ryan"), another ICB executive, that

Sole City did not have the necessary funds to make the payments promised by Safdeye on

October 21.

30.     In actuality, Sole City had available funds, which Defendants expended to

commence operation of a new apparel division at Sole City and to pay for substantial personal

expenses of Safdeye and his family members.

31.     On November 11, 2003, in order to ameliorate ICB Asia's concerns about

growing balances due and defraud ICB Asia into deferring collection action, Kandall presented

Scurlock with another bogus payment plan.  This time, Kandall falsely told Scurlock, among

other things, that Sole City would sell the Licensed Products "in the normal course of business

and not dump them in the market" and use the proceeds to make substantial monthly payments to

ICB Asia beginning on November 20 and continuing, until the entire outstanding amount was paid in May 20, 2004

32.    During a meeting attended by Safdeye, Featherston, and Ryan on or about December 3, 2003, Safdeye falsely represented that Sole City did not have the money to make the payments proposed by Kandall on November 11.

33.    In fact, Defendants' never intended to adhere to the payment schedule proffered on November 11, 2003, and in furtherance of their ongoing fraudulent scheme to forestall ICB Asia's collection efforts, Defendants continued throughout the month of December 2003 to present ICB with one fraudulent proposal after another as to how and when the debt to ICB Asia would be paid.

34.    For example, during the December 3, 2003 meeting with Featherston and Ryan, Safdeye proposed a fraudulent scheme whereby Sole City's Korean partner would open a $200,000 letter of credit with a Chinese bank, and ICB would have a Chinese shoe factory fabricate invoices for bogus production, which could then be presented to the bank for collection pursuant to the newly opened letter of credit.  ICB declined to participate in this fraud.

35.    On or about December 5, 2003, Kandall tendered yet another phony payment plan, in which he misrepresented to ICB that Sole City would sell $700,000 worth of Licensed Product it had in its inventory and pay the entire proceeds to ICB Asia to reduce the debt.  By mid-December, however, Kandall reneged on this plan, with the excuse that Sole City's bank would not permit the sale of proceeds to be disbursed to ICB Asia because of Sole City's purportedly poor financial condition.

36.    During the third week of December 2003, as ICB continued to press for payment, Bernstein and Kandall again misrepresented to Featherston that Sole City lacked the funds to pay

ICB Asia's invoices, but assured Featherston that Safdeye was going to pledge one of his two houses as security to finance the payment of Sole City's debt. This representation concerning Defendants' intent to pay the money, like the many that preceded it, was false when made: Kandall and Bernstein were aware that Safdeye had no intention of financing the payment of ICB Asia's debt, by using his house as security or otherwise.

37.    During another meeting later in December 2003, Bernstein and Kandall presented yet another fraudulent payment schedule to Featherston, pursuant to which Sole City would begin paying ICB Asia a <u>minimum</u> of $100,000 per month in January 2004. Although Sole City paid ICB Asia $50,000 in mid-January, and another $50,000 in mid-February, when pushed in late February for the second $100,000 payment, Safdeye and Kandall again falsely represented to ICB that Sole City lacked the financial wherewithal to make any further payments. Thereafter, no further payments were made.

38.    While awaiting the $100,000 monthly payments promised by Kandall and Bernstein, in reliance on Defendants' representations that Sole City would pay ICB Asia $100,000 per month until the debt was paid, ICB Asia secured bank financing to fund its working capital needs. But for Sole City's failure to pay for the Licensed Products ordered and accepted, ICB Asia would have had sufficient working capital and would not have had to finance its operations.

39.    The repeated representations by Safdeye, Kandall and Bernstein that Sole City lacked the financial means to pay for the Licensed Product were false and misleading. For example, during the latter part of November 2003, a large national retail chain (FootAction) had not only sent Sole City a substantial payment for Licensed Product delivered to it, but FootAction also had returned to Sole City the goods it had paid for, thus providing Sole City

9

with both the cash to pay ICB Asia for those goods and the opportunity to resell the same inventory for still additional profits which could also have been paid to ICB Asia.  None of the proceeds from the sale of the FootAction goods, however, were paid to ICB Asia.

40.     In addition, during this same period, Defendants expended considerable funds planning and opening a new apparel division, embarking on new ventures to design manufacture and sell apparel under several trademarks, including "School of Hard Knocks" and "Legends", hiring new executives, and exhibiting and promoting Sole City's new apparel lines at the "MAGIC Show", a large trade show.

41.     Each and every representation made by Defendants between September 2003 and March 2004 that Sole City would pay its debt to ICB Asia, including the specific representations made by Safdeye, Kandall and Bernstein set forth above, were false when made.  Defendants made repeated false promises to pay and repeatedly misrepresented Sole City's financial condition with the specific intent of inducing ICB Asia to forestall all action to collect the debt owed to it by Sole City and to continue to supply Sole City with Licensed Products.

42.     During January and February, and the early weeks of March 2004, ICB Asia repeatedly demanded payment from Sole City, verbally and in writing.  Defendants continued to acknowledge the debt and assure ICB Asia that they intended to pay, but repeatedly misrepresented that Sole City did not have the money to do so and did not know when it would.

43.     On March 12, 2004, ICB Asia sent a letter to Defendants demanding payment of all outstanding debts.  While Defendants have admitted the validity of the amounts due to ICB Asia, Defendants have ignored ICB Asia's demand and have persisted in their refusal to pay any portion of the outstanding debts.

## THE LUDACRIS CONTRACT

44.    In or about early September 2003, Defendants advised ICB that Sole City had entered into an agreement with the popular rap artist "Ludacris" for the use of the Ludacris name on TROOP branded footwear (the "Ludacris Project").

45.    Defendants induced ICB to financially support the Ludacris Project by misrepresenting to ICB (a) that the Ludacris name was to be used exclusively on the Licensed Product (i.e., TROOP branded footwear) and in connection with the TROOP brand; and (b) that Defendants intended to work jointly and cooperatively with ICB to design and promote the new products.

46.    In a letter agreement, dated September 16, 2003, Safdeye reaffirmed Defendants' agreements (i) to work jointly with ICB to design and promote the new TROOP/Ludacris products, and (ii) that no commitments with respect to the Ludacris Project would be made without ICB's prior consent.

47.    In late September 2003, in reliance on Defendants' representations, ICB US delivered a check to Defendants in the amount of $62,500, representing fifty percent of the Ludacris signing bonus.  In a letter dated September 30, 2003, confirming receipt of the money, Kandall expressly reiterated Defendants' earlier misrepresentations to ICB that the Ludacris Project was to involve "the promotion of footwear bearing the Ludacris name by Troop".

48.    Defendant Dolce, Sole City's senior designer, was responsible for developing the new Ludacris footwear line.  From the time the Ludacris contract was executed, through sometime in mid-October 2003, Dolce worked with Scurlock on a daily basis, frequently meeting at Sole City's offices.  During this period, Dolce and Scurlock, among other things,

reviewed and revised footwear designs, made plans to travel overseas together to set up the manufacture of the product, and worked together on marketing and advertising plans.

49.    In reliance on the repeated false representations by each of the Defendants, including Dolce, that the Ludacris brand would be used exclusively on and in connection with Licensed Product, ICB expended significant resources working with Defendants to design the new product line and plan its promotion.  ICB Asia also expended significant resources to design and produce production molds for the new co-branded footwear, and to manufacture sample product to be delivered to Ludacris for his personal use.

50.    In the latter part of October 2003, however, Dolce began to work less frequently with Scurlock on the Ludacris Project.  Throughout this period, however, Dolce continued to falsely represent to Scurlock that the Ludacris Project was proceeding in accordance with the parties' agreements and plans.

51.    Then, on or about November 11, 2003, Defendants purported to unilaterally terminate the Ludacris Project by referencing (in the bogus payment plan that Kandall submitted to Scurlock), their intention to proceed with Ludacris branded footwear without the use of any of the TROOP Trademarks and without the participation of ICB.  Defendants also falsely indicated in the November 11, 2003 payment plan that they would repay ICB US the $62,500 ICB US had contributed to the Ludacris signing bonus.

52.    In attempting to justify their decision, Defendants represented to ICB that the Ludacris representatives had learned of certain disturbing rumors concerning the history of the TROOP brand, which rumors were false, and did not wish to proceed with the project if the TROOP Trademarks and ICB continued to be involved.

53.     That representation was false.  The Ludacris representatives had not insisted, or even suggested, that ICB and the TROOP brand be excluded from the Ludacris Project.  Rather, Defendants advised the Ludacris representatives that they were not interested in producing Ludacris' branded footwear if such footwear also displayed the TROOP brand.

54.     Similarly, Defendants' representation that they intended to repay ICB the $62,500 it paid in consideration for the Ludacris Project was false.  Defendants never intended to repay ICB the money.  Nor did Defendants intend to pay ICB Asia for the TROOP/Ludacris production molds and samples manufactured at Dolce's request and to his specifications.

55.     Rather, Defendants, including Dolce, made the false representations concerning the withdrawal from the Ludacris Project and their intent to repay ICB the $62,500 in order to induce ICB to forfeit its valuable rights to participate in the Ludacris Project and to enjoy the benefits thereof.

**FIRST CLAIM FOR RELIEF**
**Federal Trademark Infringement Against Defendants Sole City and Safdeye**

56.     ICB US repeats each and every allegation set forth in paragraphs 1 through 55 above, as if fully set forth herein.

57.     Sole City is run for the benefit, and as an alter ego, of Safdeye.  Safdeye has complete dominion and control over Sole City, ignores Sole City's corporate form, and operates the enterprise for his own personal benefit and for the personal benefit of his family.

58.     Safdeye has used Sole City to orchestrate and perpetrate the misconduct alleged herein.

59.    Sole City has engaged in trademark infringement in violation of 15 U.S.C. § 1114.  That infringement was willful, wanton and malicious.  Safdeye is personally responsible for that infringement.

60.    Sole City's and Safdeye's misconduct has injured ICB US in an amount to be determined at trial.  Sole City's and Safdeye's misconduct also has caused and will continue to cause irreparable injury to ICB US, for which it has no adequate remedy at law.

**SECOND CLAIM FOR RELIEF**
**Federal False Designation of Origin Against Defendants Sole City and Safdeye**

61.    ICB US repeats each and every allegation set forth in paragraphs 1 through 60 above, as if fully set forth herein.

62.    Sole City is run for the benefit, and as an alter ego, of Safdeye.  Safdeye has complete dominion and control over Sole City, ignores Sole City's corporate form, and operates the enterprise for his own personal benefit and for the personal benefit of his family.

63.    Safdeye has used Sole City to orchestrate and perpetrate the misconduct alleged herein.

64.    Sole City has made use of false designations of origin and/or false or misleading representations of fact, in violation of 15 U.S.C. § 1125(a).  That misconduct was willful, wanton and malicious.  Safdeye is personally responsible for that misconduct.

65.    Sole City's and Safdeye's misconduc t has injured ICB US in an amount to be determined at trial.  Sole City's and Safdeye's misconduct also has caused and will continue to cause irreparable injury to ICB US, for which it has no adequate remedy at law.

### THIRD CLAIM FOR RELIEF
### <u>Federal False Advertising Against Defendants Sole City and Safdeye</u>

66.    ICB US repeats each and every allegation set forth in paragraphs 1 through 65 above, as if fully set forth herein.

67.    Sole City is run for the benefit, and as an alter ego, of Safdeye.  Safdeye has complete dominion and control over Sole City, ignores Sole City's corporate form, and operates the enterprise for his own personal benefit and for the personal benefit of his family.

68.    Safdeye has used Sole City to orchestrate and perpetrate the misconduct alleged herein.

69.    Sole City has made use of false advertising and/or false or misleading representations of fact which will cause confusion and mistake among the consuming public that its articles emanate from, or are associated with, ICB US, in violation of 15 U.S.C. § 1125(a). That misconduct was willful, wanton and malicious.  Safdeye is personally responsible for that misconduct.

70.    Sole City's and Safdeye's misconduct has injured ICB US in an amount to be determined at trial.  Sole City's and Safdeye's misconduct  also has caused and will continue to cause irreparable injury to ICB US, for which it has no adequate remedy at law.

### FOURTH CLAIM FOR RELIEF
### <u>Common Law Trademark Infringement Against Defendants Sole City and Safdeye</u>

71.    ICB US repeats each and every allegation set forth in paragraphs 1 through 70 above, as if fully set forth herein.

72.     Sole City is run for the benefit, and as an alter ego, of Safdeye.  Safdeye has complete dominion and control over Sole City, ignores Sole City's corporate form, and operates the enterprise for his own personal benefit and for the personal benefit of his family.

73.     Safdeye has used Sole City to orchestrate and perpetrate the misconduct alleged herein.

74.     Sole City has engaged in trademark infringement in violation of the common law of the State of New York.  That misconduct was willful, wanton and malicious.  Safdeye is personally responsible for that misconduct.

75.     Sole City's and Safdeye's misconduct has injured ICB US in an amount to be determined at trial.  Sole City's and Safdeye's misco nduct also has caused and will continue to cause irreparable injury to ICB US, for which it has no adequate remedy at law.

### FIFTH CLAIM FOR RELIEF
### Breach of License Agreement Against Defendants Sole City and Safdeye

76.     ICB US repeats each and every allegation set forth in paragraphs 1 through 75 above, as if fully set forth herein.

77.     Sole City is run for the benefit, and as an alter ego, of Safdeye.  Safdeye has complete dominion and control over Sole City, ignores Sole City's corporate form, and operates the enterprise for his own personal benefit and for the personal benefit of his family.

78.     Safdeye has used Sole City to orchestrate and perpetrate the misconduct alleged herein.

79.     Sole City has breached the TROOP License.  Safdeye is personally responsible for that breach.

16

80.    Sole City's and Safdeye's misconduct has injured ICB US in an amount to be determined at trial.

## SIXTH CLAIM FOR RELIEF
### Breach of Ludacris Agreement Against Defendants Sole City and Safdeye

81.    ICB US repeats each and every allegation set forth in paragraphs 1 through 80 above, as if fully set forth herein.

82.    Sole City is run for the benefit, and as an alter ego, of Safdeye.  Safdeye has complete dominion and control over Sole City, ignores Sole City's corporate form, and operates the enterprise for his own personal benefit and for the personal benefit of his family.

83.    Safdeye has used Sole City to orchestrate and perpetrate the misconduct alleged herein.

84.    Sole City has breached the agreement with ICB US regarding the Ludacris Project.  Safdeye is personally responsible for that breach.

85.    Sole City's and Safdeye's misconduct has injured ICB US in an amount to be determined at trial.

## SEVENTH CLAIM FOR RELIEF
### Fraud Against All Defendants

86.    ICB US repeats each and every allegation set forth in paragraphs 1 through 85 above, as if fully set forth herein.

87.    As outlined above, Defendants made material misrepresentations to ICB US concerning Sole City's intent and ability to make payments due and concerning the Ludacris Project, which representations Defendants knew to be false when made.

88.    Defendants' misrepresentations were made to benefit all Defendants financially and were knowingly made with the intent to deceive ICB US, to forestall ICB US from taking

action to collect outstanding debts, and to induce ICB US to continue to work on and fund the Ludacris Project.

89.    ICB US was ignorant of the true facts and reasonably relied upon the misrepresentations made by the Defendants to its detriment.

90.    As a result of Defendants' actions, ICB US has been damaged in an amount to be proven at trial.

91.    Defendants' actions were committed with malice and with the intent to defraud. As a result, Defendants are liable to ICB US for punitive damages in an amount to be determined at trial.

**EIGHTH CLAIM FOR RELIEF**
**<u>Negligent Misrepresentation Against Defendants Sole City and Safdeye</u>**

92.    ICB US repeats each and every allegation set forth in paragraphs 1 through 91 above as if fully set forth herein.

93.    Sole City is run for the benefit, and as an alter ego, of Safdeye. Safdeye has complete dominion and control over Sole City, ignores Sole City's corporate form, and operates the enterprise for his own personal benefit and for the personal benefit of his family.

94.    Safdeye has used Sole City to orchestrate and perpetrate the fraudulent scheme alleged herein.

95.    As a result, both Sole City and Safdeye are in privity of contract with ICB US.

96.    Defendants negligently or recklessly made statements, as set forth above, concerning facts material to the relationship between ICB US and Defendants, which statements Defendants knew or should have known were false. Those misrepresentations were made for all Defendants' financial benefit.

97.     Defendants' misrepresentations were made to forestall ICB US from taking action to collect the outstanding debts, and to induce ICB US to continue to work on and fund the Ludacris Project.

98.     ICB US was ignorant of the true facts, and reasonably relied upon the misrepresentations made by the Defendants to its detriment.  ICB US would have taken action to recover its outstanding debt and would not have participated in the Ludacris Project but for the misstatements by the Defendants.

99.     Defendants had actual knowledge of the wrongfulness of making misstatements and the high probability that injury or damage to ICB US would result. Despite that knowledge, Defendants negligently or recklessly pursued that course of conduct.

100.    As a result of Defendants' actions, ICB US has been damaged in an amount to be proven at trial.

**NINTH CLAIM FOR RELIEF**
**Unjust Enrichment Against Defendants Sole City and Safdeye**

101.    ICB US repeats each and every allegation set forth in paragraphs 1 through 100 above as if fully set forth herein.

102.    Sole City is run for the benefit, and as an alter ego, of Safdeye.  Safdeye has complete dominion and control over Sole City, ignores Sole City's corporate form, and operates the enterprise for his own personal benefit and for the personal benefit of his family.

103.    Safdeye has used Sole City to orchestrate and perpetrate the fraudulent scheme alleged herein.

104.    As a result of the wrongful conduct alleged herein, Sole City and Safdeye were unjustly enriched.

105.    As a result, ICB US has been damaged in an amount to be proven at trial.

WHEREFORE, ICB US demands judgment as follows:

1.    Preliminarily and permanently enjoining and restraining Defendants, their respective subsidiaries, affiliates, divisions, officers, directors, principals, servants, employees, successors and assigns, and all those in active concert or participation with them from:

(a)  imitating, copying or making unauthorized use of the TROOP Trademarks;

(b)  manufacturing, importing, exporting, distributing, circulating, selling, offering for sale, advertising, promoting or displaying any product bearing any unauthorized reproduction, copy, counterfeit or colorable imitation of any of the TROOP Trademarks;

(c)  using any unauthorized reproduction, copy, counterfeit or colorable imitation of the TROOP Trademarks, in connection with the manufacture, promotion, advertisement, display, sale, offering for sale, production, import, export, circulation or distribution of any product in such manner as to relate or connect, or tend to relate or connect, such product in any way with ICB US or to any goods sold, sponsored, approved by, or connected with ICB US;

(d)   making any statement or representation whatsoever that falsely designates the origin of the goods as those of ICB US, or that is false or misleading with respect to ICB US; and

(e)  engaging in any other activity, including the effectuation of assignments or transfers of its interests in reproductions, copies, counterfeit or colorable imitations of the TROOP Trademarks, the formation of other corporations, partnerships, associations or other entities or the utilization of any other devices, for the purpose of circumventing, evading, avoiding or otherwise violating the prohibitions set forth in subsections 1(a) through 1(d) above.

2.    Directing that Defendants deliver for destruction all products, labels, tags,

artwork, prints, signs, packages, dies, wrappers, receptacles and advertisements in their possession, custody or control bearing infringements of the "TROOP Trademarks, and/or any reproductions, copies, counterfeit or colorable imitations thereof, including all plates, molds, matrices and other means of making such imitations of the TROOP Trademarks.

3.      Directing such other relief as the Court may deem appropriate to prevent the trade and public from deriving any erroneous impression that any product at issue in this case that has been offered for sale, sold or otherwise circulated or promoted by Defendants are authorized by ICB US or is related to or associated in any way with ICB US's products.

4.      On the First, Second and Third Claims for Relief, awarding ICB US all damages sustained by ICB US as a result of Defendants' wrongful acts and directing that such damages be trebled, since Defendants' acts were willful.

5.      On the First, Second and Third Claims for Relief, requiring Defendants to account and pay over to ICB US all profits realized by their wrongful acts and directing that such profits be trebled, since Defendants' acts were willful.

6.      On the First, Second and Third Claims for Relief, awarding ICB US its costs and reasonable attorneys' and investigatory fees and expenses, together with prejudgment interest.

7.      On the Fourth Claim for Relief for common law trademark infringement, awarding ICB US damages in an amount to be determined at trial.

8.      On the Fifth Claim for Relief for breach of license agreement, awarding ICB US damages in an amount to be determined at trial.

9.      On the Sixth Claim for Relief for breach of Ludacris agreement, awarding ICB US damages in an amount to be determined at trial.

10.     On the Seventh Claim for Relief for fraud, awarding ICB US damages in an amount to be determined at trial.

11.     On the Eighth Claim for relief for negligent misrepresentation, awarding ICB US damages in an amount to be determined at trial.

12.     On the Ninth Claim for Relief for unjust enrichment, awarding ICB US damages in an amount to be determined at trial.

13.     Awarding ICB US its costs and reasonable attorneys' fees and expenses, together with pre-judgment interest.

14.     Awarding ICB Asia punitive damages in amount to be determined at trial.

15.     That the Court grants such other and further relief as may be just and proper.

ICB US demands a trial by jury as to all issues to be decided in this matter.

Dated: New York, New York
       April 16, 2004                         GURSKY & PARTNERS, LLP
                                              Attorneys for ICB US


                              By:     s/ Ira S. Sacks_____
                                      Ira S. Sacks (IS 2861)
                                      Esther S. Trakinski (ET 7791)
                                      1350 Broadway, 11th Floor
                                      New York, NY 10018
                                      (212) 904-1234