# EXHIBIT A

# United States District Court

SOUTHERN _____ DISTRICT OF _____ NEW YORK

Innovative Custom Brands Intl., Inc.

Plaintiff,

**SUMMONS IN A CIVIL CASE**

V.

SOLE CITY, INC., SOLOMON SAFDEYE, ALAN
KANDALL, JEFFREY BERNSTEIN and MARC
DOLCE

Defendants.

CASE NUMBER:

# 04 CV 2937

*ECF CASE*

TO: (Name and address of defendant)

Sole City, Inc.
141 West 36th Street
New York, NY 10018

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

Gursky & Partners, LLP
1350 Broadway, 11th Floor
New York, New York 10018

an answer to the complaint which is herewith served upon you, within _____20_____ days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

J. MICHAEL McMAHON

DATE    APR 1 6 2004

CLERK
*Melanie L. Lopez*

(BY) DEPUTY CLERK

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

| | | |
|---|---|---|
| INNOVATIVE CUSTOM BRANDS INTL., INC. | : | Civil Action No. |
| | : | |
| Plaintiff, | : | |
| | : | |
| -against- | : | **COMPLAINT** |
| | : | |
| SOLE CITY, INC., SOLOMON SAFDEYE, | : | **PLAINTIFF DEMANDS** |
| ALAN KANDALL, JEFFREY BERNSTEIN and | : | **TRIAL BY JURY** |
| MARC DOLCE | : | |
| | : | |
| Defendants. | : | |

-------------------------------------------------------------------x

Plaintiff Innovative Custom Brands Intl., Inc. ("ICB US"), by its attorneys Gursky &

Partners, LLP, for its Complaint against Defendants Sole City, Inc. ("Sole City"), Solomon

Safdeye ("Safdeye"), Alan Kandall ("Kandall"), Jeffrey Bernstein ("Bernstein") and Mark Dolce

("Dolce"), alleges on knowledge as to its own acts and otherwise on information and belief as

follows:

## NATURE OF THE ACTION

1.      In this action, Plaintiff asserts claims for trademark infringement, false

designation of origin and false advertising under the Lanham Act, 15 U.S.C. § 1051 et seq. (the

"Lanham Act"), common law trademark infringement, breaches of contract, fraud, negligent

misrepresentation and unjust enrichment in violation of, and pursuant to, the laws of the State of

New York. Plaintiff's claims arise out of Defendants' wrongful conduct in (i) violating

Plaintiff's federal and common law trademark rights; (ii) numerous breaches of two agreements;

and (iii) making material misrepresentations to Plaintiff which were intended to, and did, induce

Plaintiff to forestall action to collect monies owed to it and to support a business arrangement between Sole City and a third party.

## JURISDICTION AND VENUE

2.    This Court has jurisdiction over this matter pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1338 and 1367.  Plaintiff's claims are predicated upon the Lanham Act, and the common law of the State of New York.

3.    Venue is properly founded in this district pursuant to 28 U.S.C. §§ 1391 (b) and (c).

## THE PARTIES

4.    Plaintiff ICB US is a Texas corporation with its principal place of business at 1350 Broadway, New York, NY 10018.  ICB US designs, manufactures and sells footwear bearing various trademarks owned by third parties, including footwear bearing numerous internationally recognized brands.  In addition, ICB US owns the word mark TROOP and various stylized marks incorporating the TROOP mark.

5.    Defendant Sole City is a Delaware corporation with its principal place of business at 141 West 36th Street, New York, NY 10018.  Sole City is engaged in the business of manufacturing and selling branded footwear to national and regional retailers throughout the United States and Canada.

6.    Defendant Safdeye is an individual domiciled in the State of New York, whose business address is 141 West 36th Street, New York, NY 10018.  Safdeye is President and sole shareholder of Defendant Sole City and dominates and controls all of Sole City's business activities, including the business activities hereinafter alleged.  Safdeye personally participated in the wrongful acts alleged herein.

2

7.      Defendant Kandall is an individual domiciled in the State of New York, whose business address is 141 West 36th Street, New York, NY 10018.  Kandall is the Chief Financial Officer of Sole City and personally participated in the wrongful acts alleged herein.

8.      Defendant Bernstein is an individual domiciled in the State of New York, whose business address is 141 West 36th Street, New York, NY 10018.  Bernstein is the Chief Operating Officer of Sole City and personally participated in the wrongful acts alleged herein.

9.      Defendant Dolce is an individual domiciled in the State of New York residing at 82 Halpin Avenue, Staten Island, NY 10312.  Dolce is a former employee of Sole City and personally participated in the wrongful acts alleged herein.

## BACKGROUND

10.     As noted above, ICB US designs, manufactures and sells footwear bearing various trademarks owned by third parties, including footwear bearing numerous internationally recognized brands.  In addition, ICB US owns the word mark TROOP and various stylized marks incorporating the TROOP mark (collectively the "TROOP Trademarks").  The TROOP Trademarks include Registered Trademark Nos. 2,022,078 and 1,534,395, and are valid, subsisting, and in full force and effect.  Registered Trademark No. 1,534,395 has achieved incontestable status pursuant to 15 U.S.C. § 1065.  ICB US and its predecessor trademark owners have been marketing products bearing the TROOP Trademarks since 1986.

11.     ICB US uses Full Creative, Ltd. d/b/a I.C.B. Asia, Co. Ltd. ("ICB Asia")(ICB US and ICB Asia are collectively referred to as "ICB"), as its exclusive manufacturing agent.

12.     Pursuant to a License Agreement dated, September 1, 2002 (the "TROOP License"), ICB US granted Sole City an exclusive right to market, sell, and distribute footwear bearing the TROOP Trademarks in the United States (the "Licensed Products").  Under the terms

3

of the TROOP License, Sole City, <u>inter alia</u>, (i) agreed to pay ICB US a royalty equal to the greater of 6% of actual net sales or certain specified minimum royalties; and (ii) was permitted to sell Licensed Products only to better quality retailers, and not to mass market or discount retailers.

13.     In addition, Sole City was obligated to purchase all Licensed Products from ICB US or its designee.  Consistent with ICB US's practice, ICB Asia was ICB US's designee to manufacture all Licensed Products pursuant to the TROOP License.

14.     In or about March 2003, Sole City began ordering Licensed Products from ICB Asia.  A Purchase Order and an Invoice was issued for each order shipped, and payment for the goods was due 90 days after shipment.

15.     Between March and December 2003, Sole City ordered and accepted delivery of approximately 110,000 pairs of Licensed Product having an invoice value in excess of $1,700,000.  To date, ICB Asia is owed approximately $1,300,000 for Licensed Products ordered and accepted by Sole City, plus more than $60,000 for sample and production molds ICB Asia manufactured at Defendants' behest.

## DEFENDANTS' WILLFUL TRADEMARK VIOLATIONS

16.     Sole City willfully infringed the TROOP Trademarks.  For example, Sole City was not licensed to use the TROOP Trademarks to sell or otherwise distribute products using the TROOP Trademarks to mass market retailers.  Without license or permission, Sole City nevertheless advertised, offered for sale and sold products to mass market retailers using the TROOP Trademarks.

17.     As more fully set forth below, Sole City repeatedly breached the TROOP License. On March 24, 2004, ICB US terminated the License Agreement for cause.  Sole City

4

acknowledged the effectiveness of that termination on March 26, 2004. Notwithstanding that termination, Sole City continues to advertise, offer for sale and/or sell products using the TROOP Trademarks.

## **MULTIPLE BREACHES OF THE TROOP LICENSE**

18.    Sole City repeatedly breached the TROOP License. Sole City breached Paragraphs 3.1 and 3.3 of the TROOP License by failing to submit reports to Licensor 30 days after each calendar quarter which summarize the sales and shipments of Licensed Products and calculate sales royalties due on such sales. Rather, Sole City has submitted no reports since the inception of the TROOP License and has ignored written requests by ICB US for the sales information to enable ICB US to calculate the Sales Royalties due.

19.    Paragraph 3.1 also provides that the Sale Royalties calculated in the quarterly reports shall be paid to Licensor within 30 days after the close of each calendar quarter. Sole City has also breached Paragraph 3.1 and has never made a royalty payment since the License term commenced.

20.    Sole City is also in breach of Paragraph 2.7 of the TROOP License, which provides that Licensee may sell License Product only to better quality retailers, and may not sell any to mass market or discount retailers. To ensure compliance with this restriction, Paragraph 2.7 requires Licensee to submit to Licensor a list of all entities and retailers to whom it intends to sell or ship Licensed Products prior to each season for Licensor's review and approval. Sole City has never adhered to this procedure.

21.    This failure is hardly surprising given that Sole City has, in fact, sold  products using the TROOP Trademarks to mass market and/or discount retailers in direct contravention of Paragraph 2.7.

22.    Sole City additionally has breached Paragraph 5.3 of the TROOP License by failing to provide Licensor with information concerning Licensee's marketing, advertising, promotion, sales and distribution of Licensed Products as requested by Licensor, and by disseminating advertising and marketing materials without Licensor's prior approval.

23.    Accordingly, on March 24, 2004, Plaintiff terminated the TROOP License under Section 10.1, subsections (a), (e), and (f), based on the foregoing breaches, and because the Licensee and its agents knowingly made false and misleading statements intended to induce ICB US to forestall efforts to enforce the royalty and other provisions of the License.

## FRAUDULENT PROMISES TO PAY

24.    By late September 2003, Defendants had ordered and accepted delivery of Licensed Products having an invoice value of more than $800,000, but had only paid for a small portion of those goods.  Thus, in late September, ICB Asia began to make repeated requests of Defendants for payment of the outstanding invoices.

25.    On or about October 14, Randy Scurlock ("Scurlock"), an employee of ICB US, met with Kandall at Sole City's offices to discuss the outstanding invoices on ICB Asia's behalf. During the meeting, Scurlock expressed ICB Asia's concern that Defendants continued to order and accept delivery of quantities of Licensed Products from ICB Asia, but persistently failed to pay for the goods.

26.    Kandall falsely assured Scurlock that Sole City would pay what it owed, and told Scurlock that he was working with Sole City's bank to secure financing to pay ICB Asia's outstanding invoices.

27.    One week later, on or about October 21, during a business trip to Hong Kong, Safdeye spoke with ICB Asia's President Daniel Chen ("Chen") about the outstanding amounts

6

Defendants owed ICB Asia. During that conversation, Safdeye acknowledged Sole City's debt to ICB Asia, and falsely promised Chen that Sole City would pay ICB Asia $200,000 on November 15, 2003, and continue to pay $200,000 per month thereafter until the entire outstanding balance was satisfied. Chen told Safdeye that Sole City's failure to pay the past due amounts in accordance with the parties' contract would have a significant adverse affect on ICB Asia's cash flow.

28.     Relying on the representations made in October by Safdeye and Kandall that Sole City was securing funding and would pay ICB Asia $200,000 per month until its debt was satisfied, ICB Asia forestalled action to collect the debt owed it, and continued to ship goods to Sole City.

29.     On or about November 6 or 7, Kandall falsely represented to the president of ICB US, Mike Featherston ("Featherston"), and Dennis Ryan ("Ryan"), another ICB executive, that Sole City did not have the necessary funds to make the payments promised by Safdeye on October 21.

30.     In actuality, Sole City had available funds, which Defendants expended to commence operation of a new apparel division at Sole City and to pay for substantial personal expenses of Safdeye and his family members.

31.     On November 11, 2003, in order to ameliorate ICB Asia's concerns about growing balances due and defraud ICB Asia into deferring collection action, Kandall presented Scurlock with another bogus payment plan. This time, Kandall falsely told Scurlock, among other things, that Sole City would sell the Licensed Products "in the normal course of business and not dump them in the market" and use the proceeds to make substantial monthly payments to

7

ICB Asia beginning on November 20 and continuing, until the entire outstanding amount was paid in May 20, 2004

32.     During a meeting attended by Safdeye, Featherston, and Ryan on or about December 3, 2003, Safdeye falsely represented that Sole City did not have the money to make the payments proposed by Kandall on November 11.

33.     In fact, Defendants' never intended to adhere to the payment schedule proffered on November 11, 2003, and in furtherance of their ongoing fraudulent scheme to forestall ICB Asia's collection efforts, Defendants continued throughout the month of December 2003 to present ICB with one fraudulent proposal after another as to how and when the debt to ICB Asia would be paid.

34.     For example, during the December 3, 2003 meeting with Featherston and Ryan, Safdeye proposed a fraudulent scheme whereby Sole City's Korean partner would open a $200,000 letter of credit with a Chinese bank, and ICB would have a Chinese shoe factory fabricate invoices for bogus production, which could then be presented to the bank for collection pursuant to the newly opened letter of credit.  ICB declined to participate in this fraud.

35.     On or about December 5, 2003, Kandall tendered yet another phony payment plan, in which he misrepresented to ICB that Sole City would sell $700,000 worth of Licensed Product it had in its inventory and pay the entire proceeds to ICB Asia to reduce the debt.  By mid-December, however, Kandall reneged on this plan, with the excuse that Sole City's bank would not permit the sale of proceeds to be disbursed to ICB Asia because of Sole City's purportedly poor financial condition.

36.     During the third week of December 2003, as ICB continued to press for payment, Bernstein and Kandall again misrepresented to Featherston that Sole City lacked the funds to pay

ICB Asia's invoices, but assured Featherston that Safdeye was going to pledge one of his two houses as security to finance the payment of Sole City's debt. This representation concerning Defendants' intent to pay the money, like the many that preceded it, was false when made: Kandall and Bernstein were aware that Safdeye had no intention of financing the payment of ICB Asia's debt, by using his house as security or otherwise.

37.    During another meeting later in December 2003, Bernstein and Kandall presented yet another fraudulent payment schedule to Featherston, pursuant to which Sole City would begin paying ICB Asia a minimum of $100,000 per month in January 2004. Although Sole City paid ICB Asia $50,000 in mid-January, and another $50,000 in mid-February, when pushed in late February for the second $100,000 payment, Safdeye and Kandall again falsely represented to ICB that Sole City lacked the financial wherewithal to make any further payments. Thereafter, no further payments were made.

38.    While awaiting the $100,000 monthly payments promised by Kandall and Bernstein, in reliance on Defendants' representations that Sole City would pay ICB Asia $100,000 per month until the debt was paid, ICB Asia secured bank financing to fund its working capital needs. But for Sole City's failure to pay for the Licensed Products ordered and accepted, ICB Asia would have had sufficient working capital and would not have had to finance its operations.

39.    The repeated representations by Safdeye, Kandall and Bernstein that Sole City lacked the financial means to pay for the Licensed Product were false and misleading. For example, during the latter part of November 2003, a large national retail chain (FootAction) had not only sent Sole City a substantial payment for Licensed Product delivered to it, but FootAction also had returned to Sole City the goods it had paid for, thus providing Sole City

with both the cash to pay ICB Asia for those goods and the opportunity to resell the same inventory for still additional profits which could also have been paid to ICB Asia. None of the proceeds from the sale of the FootAction goods, however, were paid to ICB Asia.

40.    In addition, during this same period, Defendants expended considerable funds planning and opening a new apparel division, embarking on new ventures to design manufacture and sell apparel under several trademarks, including "School of Hard Knocks" and "Legends", hiring new executives, and exhibiting and promoting Sole City's new apparel lines at the "MAGIC Show", a large trade show.

41.    Each and every representation made by Defendants between September 2003 and March 2004 that Sole City would pay its debt to ICB Asia, including the specific representations made by Safdeye, Kandall and Bernstein set forth above, were false when made. Defendants made repeated false promises to pay and repeatedly misrepresented Sole City's financial condition with the specific intent of inducing ICB Asia to forestall all action to collect the debt owed to it by Sole City and to continue to supply Sole City with Licensed Products.

42.    During January and February, and the early weeks of March 2004, ICB Asia repeatedly demanded payment from Sole City, verbally and in writing. Defendants continued to acknowledge the debt and assure ICB Asia that they intended to pay, but repeatedly misrepresented that Sole City did not have the money to do so and did not know when it would.

43.    On March 12, 2004, ICB Asia sent a letter to Defendants demanding payment of all outstanding debts. While Defendants have admitted the validity of the amounts due to ICB Asia, Defendants have ignored ICB Asia's demand and have persisted in their refusal to pay any portion of the outstanding debts.

10

## THE LUDACRIS CONTRACT

44.    In or about early September 2003, Defendants advised ICB that Sole City had entered into an agreement with the popular rap artist "Ludacris" for the use of the Ludacris name on TROOP branded footwear (the "Ludacris Project").

45.    Defendants induced ICB to financially support the Ludacris Project by misrepresenting to ICB (a) that the Ludacris name was to be used exclusively on the Licensed Product (i.e., TROOP branded footwear) and in connection with the TROOP brand; and (b) that Defendants intended to work jointly and cooperatively with ICB to design and promote the new products.

46.    In a letter agreement, dated September 16, 2003, Safdeye reaffirmed Defendants' agreements (i) to work jointly with ICB to design and promote the new TROOP/Ludacris products, and (ii) that no commitments with respect to the Ludacris Project would be made without ICB's prior consent.

47.    In late September 2003, in reliance on Defendants' representations, ICB US delivered a check to Defendants in the amount of $62,500, representing fifty percent of the Ludacris signing bonus.  In a letter dated September 30, 2003, confirming receipt of the money, Kandall expressly reiterated Defendants' earlier misrepresentations to ICB that the Ludacris Project was to involve "the promotion of footwear bearing the Ludacris name by Troop".

48.    Defendant Dolce, Sole City's senior designer, was responsible for developing the new Ludacris footwear line.  From the time the Ludacris contract was executed, through sometime in mid-October 2003, Dolce worked with Scurlock on a daily basis, frequently meeting at Sole City's offices.  During this period, Dolce and Scurlock, among other things,

11

reviewed and revised footwear designs, made plans to travel overseas together to set up the manufacture of the product, and worked together on marketing and advertising plans.

49.    In reliance on the repeated false representations by each of the Defendants, including Dolce, that the Ludacris brand would be used exclusively on and in connection with Licensed Product, ICB expended significant resources working with Defendants to design the new product line and plan its promotion.  ICB Asia also expended significant resources to design and produce production molds for the new co-branded footwear, and to manufacture sample product to be delivered to Ludacris for his personal use.

50.    In the latter part of October 2003, however, Dolce began to work less frequently with Scurlock on the Ludacris Project.  Throughout this period, however, Dolce continued to falsely represent to Scurlock that the Ludacris Project was proceeding in accordance with the parties' agreements and plans.

51.    Then, on or about November 11, 2003, Defendants purported to unilaterally terminate the Ludacris Project by referencing (in the bogus payment plan that Kandall submitted to Scurlock), their intention to proceed with Ludacris branded footwear without the use of any of the TROOP Trademarks and without the participation of ICB.  Defendants also falsely indicated in the November 11, 2003 payment plan that they would repay ICB US the $62,500 ICB US had contributed to the Ludacris signing bonus.

52.    In attempting to justify their decision, Defendants represented to ICB that the Ludacris representatives had learned of certain disturbing rumors concerning the history of the TROOP brand, which rumors were false, and did not wish to proceed with the project if the TROOP Trademarks and ICB continued to be involved.

53.     That representation was false.  The Ludacris representatives had not insisted, or even suggested, that ICB and the TROOP brand be excluded from the Ludacris Project.  Rather, Defendants advised the Ludacris representatives that they were not interested in producing Ludacris' branded footwear if such footwear also displayed the TROOP brand.

54.     Similarly, Defendants' representation that they intended to repay ICB the $62,500 it paid in consideration for the Ludacris Project was false.  Defendants never intended to repay ICB the money.  Nor did Defendants intend to pay ICB Asia for the TROOP/Ludacris production molds and samples manufactured at Dolce's request and to his specifications.

55.     Rather, Defendants, including Dolce, made the false representations concerning the withdrawal from the Ludacris Project and their intent to repay ICB the $62,500 in order to induce ICB to forfeit its valuable rights to participate in the Ludacris Project and to enjoy the benefits thereof.

### FIRST CLAIM FOR RELIEF
**Federal Trademark Infringement Against Defendants Sole City and Safdeye**

56.     ICB US repeats each and every allegation set forth in paragraphs 1 through 55 above, as if fully set forth herein.

57.     Sole City is run for the benefit, and as an alter ego, of Safdeye.  Safdeye has complete dominion and control over Sole City, ignores Sole City's corporate form, and operates the enterprise for his own personal benefit and for the personal benefit of his family.

58.     Safdeye has used Sole City to orchestrate and perpetrate the misconduct alleged herein.

59.    Sole City has engaged in trademark infringement in violation of 15 U.S.C. § 1114. That infringement was willful, wanton and malicious. Safdeye is personally responsible for that infringement.

60.    Sole City's and Safdeye's misconduct has injured ICB US in an amount to be determined at trial. Sole City's and Safdeye's misconduct also has caused and will continue to cause irreparable injury to ICB US, for which it has no adequate remedy at law.

## SECOND CLAIM FOR RELIEF
### Federal False Designation of Origin Against Defendants Sole City and Safdeye

61.    ICB US repeats each and every allegation set forth in paragraphs 1 through 60 above, as if fully set forth herein.

62.    Sole City is run for the benefit, and as an alter ego, of Safdeye. Safdeye has complete dominion and control over Sole City, ignores Sole City's corporate form, and operates the enterprise for his own personal benefit and for the personal benefit of his family.

63.    Safdeye has used Sole City to orchestrate and perpetrate the misconduct alleged herein.

64.    Sole City has made use of false designations of origin and/or false or misleading representations of fact, in violation of 15 U.S.C. § 1125(a). That misconduct was willful, wanton and malicious. Safdeye is personally responsible for that misconduct.

65.    Sole City's and Safdeye's misconduct has injured ICB US in an amount to be determined at trial. Sole City's and Safdeye's misconduct also has caused and will continue to cause irreparable injury to ICB US, for which it has no adequate remedy at law.

14

### THIRD CLAIM FOR RELIEF
### Federal False Advertising Against Defendants Sole City and Safdeye

66.    ICB US repeats each and every allegation set forth in paragraphs 1 through 65 above, as if fully set forth herein.

67.    Sole City is run for the benefit, and as an alter ego, of Safdeye. Safdeye has complete dominion and control over Sole City, ignores Sole City's corporate form, and operates the enterprise for his own personal benefit and for the personal benefit of his family.

68.    Safdeye has used Sole City to orchestrate and perpetrate the misconduct alleged herein.

69.    Sole City has made use of false advertising and/or false or misleading representations of fact which will cause confusion and mistake among the consuming public that its articles emanate from, or are associated with, ICB US, in violation of 15 U.S.C. § 1125(a). That misconduct was willful, wanton and malicious. Safdeye is personally responsible for that misconduct.

70.    Sole City's and Safdeye's misconduct has injured ICB US in an amount to be determined at trial. Sole City's and Safdeye's misconduct also has caused and will continue to cause irreparable injury to ICB US, for which it has no adequate remedy at law.

### FOURTH CLAIM FOR RELIEF
### Common Law Trademark Infringement Against Defendants Sole City and Safdeye

71.    ICB US repeats each and every allegation set forth in paragraphs 1 through 70 above, as if fully set forth herein.

15

72.    Sole City is run for the benefit, and as an alter ego, of Safdeye.  Safdeye has complete dominion and control over Sole City, ignores Sole City's corporate form, and operates the enterprise for his own personal benefit and for the personal benefit of his family.

73.    Safdeye has used Sole City to orchestrate and perpetrate the misconduct alleged herein.

74.    Sole City has engaged in trademark infringement in violation of the common law of the State of New York.  That misconduct was willful, wanton and malicious.  Safdeye is personally responsible for that misconduct.

75.    Sole City's and Safdeye's misconduct has injured ICB US in an amount to be determined at trial.  Sole City's and Safdeye's misconduct also has caused and will continue to cause irreparable injury to ICB US, for which it has no adequate remedy at law.

## FIFTH CLAIM FOR RELIEF
### Breach of License Agreement Against Defendants Sole City and Safdeye

76.    ICB US repeats each and every allegation set forth in paragraphs 1 through 75 above, as if fully set forth herein.

77.    Sole City is run for the benefit, and as an alter ego, of Safdeye.  Safdeye has complete dominion and control over Sole City, ignores Sole City's corporate form, and operates the enterprise for his own personal benefit and for the personal benefit of his family.

78.    Safdeye has used Sole City to orchestrate and perpetrate the misconduct alleged herein.

79.    Sole City has breached the TROOP License.  Safdeye is personally responsible for that breach.

16

80.  Sole City's and Safdeye's misconduct has injured ICB US in an amount to be determined at trial.

## SIXTH CLAIM FOR RELIEF
### Breach of Ludacris Agreement Against Defendants Sole City and Safdeye

81.  ICB US repeats each and every allegation set forth in paragraphs 1 through 80 above, as if fully set forth herein.

82.  Sole City is run for the benefit, and as an alter ego, of Safdeye.  Safdeye has complete dominion and control over Sole City, ignores Sole City's corporate form, and operates the enterprise for his own personal benefit and for the personal benefit of his family.

83.  Safdeye has used Sole City to orchestrate and perpetrate the misconduct alleged herein.

84.  Sole City has breached the agreement with ICB US regarding the Ludacris Project.  Safdeye is personally responsible for that breach.

85.  Sole City's and Safdeye's misconduct has injured ICB US in an amount to be determined at trial.

## SEVENTH CLAIM FOR RELIEF
### Fraud Against All Defendants

86.  ICB US repeats each and every allegation set forth in paragraphs 1 through 85 above, as if fully set forth herein.

87.  As outlined above, Defendants made material misrepresentations to ICB US concerning Sole City's intent and ability to make payments due and concerning the Ludacris Project, which representations Defendants knew to be false when made.

88.  Defendants' misrepresentations were made to benefit all Defendants financially and were knowingly made with the intent to deceive ICB US, to forestall ICB US from taking

17

action to collect outstanding debts, and to induce ICB US to continue to work on and fund the Ludacris Project.

89.     ICB US was ignorant of the true facts and reasonably relied upon the misrepresentations made by the Defendants to its detriment.

90.     As a result of Defendants' actions, ICB US has been damaged in an amount to be proven at trial.

91.     Defendants' actions were committed with malice and with the intent to defraud. As a result, Defendants are liable to ICB US for punitive damages in an amount to be determined at trial.

## EIGHTH CLAIM FOR RELIEF
### Negligent Misrepresentation Against Defendants Sole City and Safdeye

92.     ICB US repeats each and every allegation set forth in paragraphs 1 through 91 above as if fully set forth herein.

93.     Sole City is run for the benefit, and as an alter ego, of Safdeye.  Safdeye has complete dominion and control over Sole City, ignores Sole City's corporate form, and operates the enterprise for his own personal benefit and for the personal benefit of his family.

94.     Safdeye has used Sole City to orchestrate and perpetrate the fraudulent scheme alleged herein.

95.     As a result, both Sole City and Safdeye are in privity of contract with ICB US.

96.     Defendants negligently or recklessly made statements, as set forth above, concerning facts material to the relationship between ICB US and Defendants, which statements Defendants knew or should have known were false.  Those misrepresentations were made for all Defendants' financial benefit.

18

97.    Defendants' misrepresentations were made to forestall ICB US from taking action to collect the outstanding debts, and to induce ICB US to continue to work on and fund the Ludacris Project.

98.    ICB US was ignorant of the true facts, and reasonably relied upon the misrepresentations made by the Defendants to its detriment.  ICB US would have taken action to recover its outstanding debt and would not have participated in the Ludacris Project but for the misstatements by the Defendants.

99.    Defendants had actual knowledge of the wrongfulness of making misstatements and the high probability that injury or damage to ICB US would result. Despite that knowledge, Defendants negligently or recklessly pursued that course of conduct.

100.    As a result of Defendants' actions, ICB US has been damaged in an amount to be proven at trial.

## NINTH CLAIM FOR RELIEF
### Unjust Enrichment Against Defendants Sole City and Safdeye

101.    ICB US repeats each and every allegation set forth in paragraphs 1 through 100 above as if fully set forth herein.

102.    Sole City is run for the benefit, and as an alter ego, of Safdeye.  Safdeye has complete dominion and control over Sole City, ignores Sole City's corporate form, and operates the enterprise for his own personal benefit and for the personal benefit of his family.

103.    Safdeye has used Sole City to orchestrate and perpetrate the fraudulent scheme alleged herein.

104.    As a result of the wrongful conduct alleged herein, Sole City and Safdeye were unjustly enriched.

105.    As a result, ICB US has been damaged in an amount to be proven at trial.

WHEREFORE, ICB US demands judgment as follows:

1.    Preliminarily and permanently enjoining and restraining Defendants, their respective subsidiaries, affiliates, divisions, officers, directors, principals, servants, employees, successors and assigns, and all those in active concert or participation with them from:

(a)  imitating, copying or making unauthorized use of the TROOP Trademarks;

(b)  manufacturing, importing, exporting, distributing, circulating, selling, offering for sale, advertising, promoting or displaying any product bearing any unauthorized reproduction, copy, counterfeit or colorable imitation of any of the TROOP Trademarks;

(c)  using any unauthorized reproduction, copy, counterfeit or colorable imitation of the TROOP Trademarks, in connection with the manufacture, promotion, advertisement, display, sale, offering for sale, production, import, export, circulation or distribution of any product in such manner as to relate or connect, or tend to relate or connect, such product in any way with ICB US or to any goods sold, sponsored, approved by, or connected with ICB US;

(d)  making any statement or representation whatsoever that falsely designates the origin of the goods as those of ICB US, or that is false or misleading with respect to ICB US; and

(e)  engaging in any other activity, including the effectuation of assignments or transfers of its interests in reproductions, copies, counterfeit or colorable imitations of the TROOP Trademarks, the formation of other corporations, partnerships, associations or other entities or the utilization of any other devices, for the purpose of circumventing, evading, avoiding or otherwise violating the prohibitions set forth in subsections 1(a) through 1(d) above.

2.    Directing that Defendants deliver for destruction all products, labels, tags,

artwork, prints, signs, packages, dies, wrappers, receptacles and advertisements in their

possession, custody or control bearing infringements of the "TROOP Trademarks, and/or any

reproductions, copies, counterfeit or colorable imitations thereof, including all plates, molds,

matrices and other means of making such imitations of the TROOP Trademarks.

3.      Directing such other relief as the Court may deem appropriate to prevent the trade

and public from deriving any erroneous impression that any product at issue in this case that has

been offered for sale, sold or otherwise circulated or promoted by Defendants are authorized by

ICB US or is related to or associated in any way with ICB US's products.

4.      On the First, Second and Third Claims for Relief, awarding ICB US all damages

sustained by ICB US as a result of Defendants' wrongful acts and directing that such damages be

trebled, since Defendants' acts were willful.

5.      On the First, Second and Third Claims for Relief, requiring Defendants to account

and pay over to ICB US all profits realized by their wrongful acts and directing that such profits

be trebled, since Defendants' acts were willful.

6.      On the First, Second and Third Claims for Relief, awarding ICB US its costs and

reasonable attorneys' and investigatory fees and expenses, together with prejudgment interest.

7.      On the Fourth Claim for Relief for common law trademark infringement,

awarding ICB US damages in an amount to be determined at trial.

8.      On the Fifth Claim for Relief for breach of license agreement, awarding ICB US

damages in an amount to be determined at trial.

9.      On the Sixth Claim for Relief for breach of Ludacris agreement, awarding ICB

US damages in an amount to be determined at trial.

10.    On the Seventh Claim for Relief for fraud, awarding ICB US damages in an amount to be determined at trial.

11.    On the Eighth Claim for relief for negligent misrepresentation, awarding ICB US damages in an amount to be determined at trial.

12.    On the Ninth Claim for Relief for unjust enrichment, awarding ICB US damages in an amount to be determined at trial.

13.    Awarding ICB US its costs and reasonable attorneys' fees and expenses, together with pre-judgment interest.

14.    Awarding ICB Asia punitive damages in amount to be determined at trial.

15.    That the Court grants such other and further relief as may be just and proper.

ICB US demands a trial by jury as to all issues to be decided in this matter.

Dated: New York, New York
       April 16, 2004

                                    GURSKY & PARTNERS, LLP
                                    Attorneys for ICB US


                        By:    _____
                                    Ira S. Sacks (IS 2861)
                                    Esther S. Trakinski (ET 7791)
                                    1350 Broadway, 11th Floor
                                    New York, NY 10018
                                    (212) 904-1234

# EXHIBIT B

1/21/03 SIGNED
COPY

## LICENSE AGREEMENT

THIS LICENSE AGREEMENT (hereafter this "Agreement"), effective as of the 1ˢᵗ day of September 2002 (the "Effective Date"), by and between Innovative Custom Brands Intl., Inc. (a/k/a ICB), a corporation existing under the laws of the State of Texas with offices located at 1350 Broadway, Suite 1912, New York, New York 10018 ("Licensor"); and Sole City, Inc., a corporation organized and existing under the laws of the State of Delaware with offices at 141 West 36ᵗʰ Street, New York, New York 10018 ("Licensee").

## W I T N E S S E T H :

WHEREAS, Licensor owns the Licensed Trademark as hereinafter defined; and

WHEREAS, Licensee desires to sell, market and distribute certain footwear that will bear the Licensed Trademark;

WHEREAS, Licensor and Licensee desire that Licensor contract manufacture all the footwear that Licensee will sell, market and distribute under the Licensed Trademark;

NOW, THEREFORE, in consideration of the promises and mutual covenants contained herein, the parties hereto agree as follows:

1. **DEFINITIONS.** As used in this Agreement the following terms shall have the meanings indicated:

1.1. **"Licensed Trademark"** shall mean the trademark TROOP and the trademarks that are the subject of the registrations therefor set forth in Exhibit A hereto.

1.2. **"Products"** shall mean footwear in international trademark class 25, including footwear for all genders and including all categories and types, but excluding socks, stockings, tights and other hosiery.

1.3. **"Territory"** shall mean the fifty states of the United States of America.

1.4. **"Licensed Products"** shall mean those Products bearing, or sold in connection with, the Licensed Trademark.

1.5. **"Net Sales"** shall mean Licensee's gross sales of Licensed Products less only returns actually received, charge backs, normal trade discounts and allowances usually granted, provided, however, that the amount of the normal trade discounts, charge backs and allowances actually granted by Licensee and deductible from gross sales in determining net sales shall not exceed an amount equal to 8% of the gross sales in any Contract Year (defined below). All sales of Licensed Products by an affiliate of Licensee shall be deemed made by Licensee.

1.6. **"Contract Year"** shall mean each twelve (12) month period commencing July 1 and concluding June 30 of the following year; provided that the first Contract Year shall be the period beginning on the Effective Date and ending June 30, 2004.

1.7.   **"Improvements"** shall mean any processes, improvements or inventions that Licensee may develop in relation to the Licensed Products or the manufacture thereof, whether or not such processes, improvements or inventions are patentable, registrable or protectable, but excluding the Licensed Trademark or any derivation thereof. It is specifically understood and agreed that designs, styles and patterns of any kind are excluded from the definition of Improvements.

## 2.   RIGHTS GRANTED

2.1.   Subject to, and conditioned upon Licensee's compliance with, the terms, limitations and provisions of this Agreement, Licensor hereby grants to Licensee the exclusive, non-transferable license to sell, market, distribute, advertise and promote the Licensed Products within the Territory during the Term of this Agreement (defined below) and to use the Licensed Trademark during the Term of this Agreement within the Territory in connection with such activities.

2.2.   Unless otherwise agreed to by the parties, Licensed Products sold, offered for sale, marketed, distributed, advertised or promoted by Licensee shall be purchased from Licensor (or a manufacturer designated by Licensor) at competitive prices and on terms and conditions mutually agreed to by Licensor and Licensee.

2.3.   Anything in this Agreement to the contrary notwithstanding, Licensee has no right or license to, and will not: (i) sell, offer to sell, market, distribute, advertise or promote any Licensed Products that have not been purchased from Licensor in accordance with this Agreement or (ii) use the Licensed Trademark in any form, logo or style other than the form, logo and style depicted in United States Trademark Registration No. 1,534,395, as such form, logo and style may be amended by Licensor from time to time, or as approved in advance in writing by Licensor. Any violation by Licensee of the immediately preceding sentence shall be deemed to be an unlicensed and unauthorized use of the Licensed Trademark and shall also constitute a material breach of this Agreement.

2.4.   Licensor hereby agrees that it has not granted or conveyed and will not grant or convey to any other party any license to sell, market, distribute, advertise or promote the Licensed Products in the Territory during the Term of this Agreement.

2.5.   Except only for the limited license granted in Section 2.1 above, Licensor specifically reserves all rights in and to the Licensed Trademark, and Licensee acknowledges that it has no rights whatsoever to the use of, and it will not use, any trade name, business name or corporate name containing the term TROOP.

2.6.   All proprietary rights and goodwill resulting from the use of the Licensed Trademark by Licensee shall inure to the benefit of Licensor.

2.7.   Licensee will sell Licensed Products only to better quality retailers and will not sell or otherwise distribute to mass market retailers. Better quality retailers are defined as those which are brand oriented and do not follow a discount pricing policy as their prime marketing strategy. To that end, prior to each season, Licensee shall provide to Licensor a list of all entities to whom it intends to sell or ship Licensed Products. In the event of a disagreement over whether

'or not an entity qualifies as a better quality retailer, Licensor's decision shall be final. Any violation by Licensee of this section 2.7 shall be deemed to be an unauthorized and unlicensed use of the Licensed Trademark and shall constitute a material breach of this Agreement.

### 3. ROYALTY

**3.1.**     Licensee shall pay to Licensor a sales royalty ("Sales Royalty") for the trademark license and for the other rights granted herein to Licensee with such Sales Royalty to be in an amount equal to six percent (6%) of all Net Sales. Licensee shall provide a report to Licensor within thirty (30) days after the close of each calendar quarter (January-March, April-June, July-September and October-December) during each Contract Year, in form and content satisfactory to Licensor, summarizing all the sales and shipments of Licensed Products during such quarter and the calculation of the Sales Royalty due thereon. Said report shall be verified by the President of Licensee. Licensee shall pay the Sales Royalty to Licensor for each calendar quarter within thirty (30) days after the close of each calendar quarter.

**3.2.**     **(a)**     Licensee guarantees to pay at least the following amounts to Licensor, regardless of the volume of Net Sales and whether or not this Agreement is terminated prior to the end of the Initial Term (as defined below): (i) $120,000 in the first Contract Year; (ii) $180,000 in the second Contract Year; and (iii) $240,000 in the third Contract Year (the "Minimum Royalty"). Upon the execution of this Agreement, Licensee will pay to Licensor a non-refundable advance of $60,000 against the Minimum Royalty due for the first Contract Year.

**(b)** If Licensee elects to extend the Term of this Agreement for the Extended Term (defined below), Licensee guarantees to pay at least the following amounts to Licensor, regardless of the volume of Net Sales and whether or not this Agreement is terminated prior to the end of the Extended Term (as defined below): (i) $300,000 in the first Contract Year of the Extended Term; (ii) $360,000 in the second Contract Year of the Extended Term; and (iii) $420,000 in the third Contract Year of the Extended Term.

**(c)** The Minimum Royalty shall be payable as follows: if in any Contract Year, the Sales Royalty payments made by Licensee to Licensor for any Contract Year fail to reach or exceed the Minimum Royalty amount for that Contract Year (as set forth above), Licensee will pay to Licensor an amount equal to the shortfall within thirty (30) days after the close of the final calendar quarter in that Contract Year. Nothing in this Agreement shall be construed as negating Licensee's obligation to pay the Minimum Royalty set forth in this Section 3.2.

**3.3.**     Licensee shall maintain separate records and accounts (in accordance with Generally Accepted Accounting Principles, consistently applied) of all shipments made, expenditures made and liabilities incurred with respect to the Licensed Products and other transactions related to the distribution, marketing, advertising, promotion or sale of the Licensed Products or otherwise undertaken pursuant to this Agreement. Such records shall be maintained for a period of three (3) years after the close of the Contract Year to which they apply. The reports required by Section 3.1 hereof shall be furnished to Licensor whether or not any shipments of Licensed Products have been made during the relevant period. Licensee shall also provide from time to time such information as Licensor may reasonably request concerning Licensee's marketing, advertising, promotion, sales and distribution of the Licensed Products. Licensor, through its employees, agents or representatives, shall have the right from time to time

to examine/audit Licensee's books, records, and procedures in order to verify information relating to the Licensed Products or the distribution, marketing, advertising, promotion or sale of the Licensed Products or otherwise related to Licensee's performance of its obligations hereunder. Should an audit disclose that Licensee underpaid the Sales Royalty for any Contract Year, Licensee shall forthwith and upon written demand pay Licensor the amount owed, together with interest thereon, at a rate of ten percent (10%) per annum calculated from the due date of such royalties. Further, should an audit disclose that Licensee underpaid royalties by a margin exceeding five percent (5%) for any Contract Year, Licensee shall pay for all costs relating to the audit.

## 4.  TERM

Unless sooner terminated as hereinafter provided, this Agreement shall commence as of the Effective Date and shall terminate on June 30, 2006 (the "Initial Term").  Provided that Licensee has complied with all of the terms, limitations and provisions of this Agreement, that Licensee has given Licensor written notice of its intention and commitment to extend the Term of this Agreement as set forth herein no later than six (6) months prior to the termination of the Initial Term, Licensee shall have the right to extend the Term of this Agreement for three additional Contract Years, the last of which will terminate on June 30, 2009 (the "Extended Term"). (The Initial Term and the Extended Term, if any, are sometimes referred to in this Agreement as the "Term of this Agreement.")

## 5.  SALES EFFORTS AND ADVERTISING COMMITMENT

5.1.    During each Contract Year, Licensee will spend on media advertising (e.g., television, radio and magazines of general circulation), including cooperative advertising, for the Licensed Products an amount that is equal to or greater than three percent (3%) of Net Sales in such Contract Year.  If the Licensee spends more than 3% in any Contract Year the overage can be applied to the following Contract Year.  Licensee shall include a written accounting of such expenditures in each calendar quarter in the royalty report for such calendar quarter required by Section 3.1 above.

5.2.    Licensee shall cooperate with Licensor (and any other licensee(s) of the Licensed Trademark) in connection with the exchange of ideas, design and other information relative to the manufacture, sale and distribution of the Licensed Products or other products to be sold under the Licensed Trademark (including but not limited to, furnishing a reasonable quantity of items in current production and related incidental materials to be distributed by any other licensee(s) of the Licensed Trademark), but nothing shall require Licensee to divulge any of its trade secrets or other confidential information.

5.3.    Licensee will use commercially reasonable efforts to maximize and supply the market demand for the Licensed Products throughout the Territory and to promote the image of quality, durability and value associated with the Licensed Trademark through advertising, tradeshows, public relations, visual merchandising and related means, subject to the restrictions and provisions of this Agreement. Licensee agrees that all of the advertising and promotional material (including, without limitation, all brochures, pamphlets, catalogs and point-of-sale material) and all of the packaging, package inserts, stationery, graphics, signage, labels, tags and brochures for the Licensed Products or which include the Licensed Trademark (such items,

together with such advertising and promotion material are hereinafter collectively referred to as the "Materials") shall be subject to Licensor's prior review and written approval and all the Materials shall be consistent with the image and prestige of the Licensed Trademark. Licensee shall not publish, broadcast, telecast, or publicly display any Materials which Licensor has not approved in advance in writing, which approval may be granted or denied in Licensor's sole and absolute discretion. Such submissions may be in the form of artwork, mock-ups, boards, draft text, or similar preliminary materials. If Licensor fails to disapprove of any Materials within ten (10) business days after Licensor's receipt of such Materials, Licensor will be deemed to have approved such Materials.

## 6. PRODUCT APPROVAL

**6.1.** Although it is Licensee's responsibility to design the Licensed Products, all the Licensed Products, including, without limitation, the quality, design and specifications (including the materials from which the Licensed Products are to be made) of and for the Licensed Products, are subject to the prior written approval of Licensor, which approval may be granted or denied in Licensor's sole and absolute discretion, which approval shall not be unreasonably withheld. To that end, unless otherwise agreed to by Licensor, at least two (2) months before the expected shipping date of any of the Licensed Products, Licensee shall submit to Licensor, for Licensor's approval, the design, specifications and materials from which the Licensed Products are to be made, including a prototype of the Licensed Products and samples of the materials from which the Licensed Products are to be made. If Licensor fails to disapprove of any such submitted design, specifications, materials, prototypes and samples within fourteen (14) days, Licensor will be deemed to have approved such submission. Licensee may not offer to sell, ship or sell any Licensed Products that have not been approved by Licensor.

**6.2.** Licensee shall provide to Licensor each season one (1) complete sample line at no expense to Licensor.

**6.3.** Licensee will handle all customer and consumer complaints pertaining to the Licensed Products in a commercially reasonable fashion. Licensee will make commercially reasonable efforts to keep a record of all such complaints for each Contract Year and provide a copy of this record to Licensor within thirty (30) days following the conclusion of each Contract Year.

## 7. INTELLECTUAL PROPERTY AND TRADEMARK USAGE AND PROTECTION

**7.1.** Licensee hereby acknowledges: (i) that the Licensed Trademark is good and valid as between the parties; (ii) that, except for rights licensed by this Agreement, Licensor has the exclusive right to the use thereof, and Licensee has no right or interest therein; (iii) that Licensee has no license, right or interest in any other trademarks, brands, or trade names owned or controlled by Licensor or its affiliates, which other trademarks, brands and trade names may be used, licensed or otherwise exploited by Licensor without any obligation or liability to Licensee; and (iv) that it will not in any way infringe or contribute to the infringement by others of the rights of Licensor in the Licensed Trademark or other trademarks, brands, or trade names of Licensor or its affiliates. Licensee will not, itself or through any third party within its control or with whom Licensee has a contractual relationship, do or permit any act or thing that will, in any way, impair



the rights of Licensor in and to the Licensed Trademark or any trademark, trade name, business name or corporate name incorporating the term TROOP or which will adversely affect the validity thereof. Licensee agrees not to assert any rights in the Licensed Trademark or any trademark confusingly similar thereto and agrees that all use by Licensee of the Licensed Trademark inures to the benefit of Licensor. Licensee agrees that it will cooperate with Licensor to make such filings or to execute such documents as Licensor deems necessary to establish or protect Licensor's rights in and to the Licensed Trademark. To the extent any rights in the Licensed Trademark, or in any trade dress used in or in connection with any of the Licensed Products or in any materials used in the advertising or promotion of Licensed Products, including without limitation, sub-brand names, are deemed to accrue to Licensee pursuant to this Agreement or otherwise, Licensee hereby assigns any and all such rights, at such time as they may be deemed to accrue, to Licensor. The provisions of this Section 7.1 shall survive any termination or expiration of this Agreement.

7.2. Licensee further agrees to take whatever action is appropriate or necessary to protect Licensor's rights in the Licensed Trademark including, without limitation, permanently affixing on the Licensed Products and all Materials all notices required under applicable law or reasonably requested by Licensor; cooperating in any new applications for registration by Licensor at Licensor's expense (including additional registrations of the Licensed Trademark as used on Licensed Products); registering as a user of the Licensed Trademark on the Licensed Products as requested by Licensor at Licensor's expense; and permanently affixing reasonably requested language to indicate the existence of the licensing arrangement, and any other notice desired by Licensor on the Licensed Products or Materials utilizing the Licensed Trademark.

7.3. Licensee shall promptly notify Licensor of any claim that is asserted, and of any action or proceeding that is threatened or commenced, in which a third party alleges that any of the Licensed Products infringe the property rights of such third party or any other entity and of any action or proceeding that is threatened or commenced in which the revocation, cancellation, or declaration of invalidity of the Licensed Trademark is sought. Licensor shall be permitted (without obligation) to handle any such claim (or resulting action or proceeding) in such manner as Licensor, in its sole discretion and expense, shall determine, including the right to assert in Licensee's name any counterclaim in any resulting action or proceeding and to settle the same. Licensee may, at its option and expense, participate, with counsel of its choice, in the settlement of, or defense against, such claim (or resulting action or proceeding), but control of the defense shall at all times remain with Licensor. In the event that Licensor is unsuccessful in settling or otherwise resolving any such claim of infringement on terms acceptable to Licensor or in defending against the revocation, cancellation, or declaration of invalidity of the Licensed Trademark, Licensor may, at its option, cancel this Agreement, effective upon notice to Licensee.

7.4. Licensee shall promptly notify Licensor of the use or intended use in the Territory by any third party of the Licensed Trademark, or of trademarks similar to or likely to be confused with the Licensed Trademark, in connection with goods in competition with the Licensed Products of which Licensee may have knowledge or suspicion. In the event of an infringement, Licensor shall have the right, in its sole discretion, to institute in Licensee's name or in Licensor's name or in Licensee's and Licensor's joint names and to prosecute, with counsel of Licensor's choice, a suit for the cessation of such infringement, and any recovery had or obtained therefrom shall be Licensor's alone; provided, however, that should Licensee desire to participate in any such legal action, Licensor may, in its sole discretion, permit Licensee to do so, with equal sharing



of costs as they arise and equal distribution of recovery as received. Licensor shall have the right to make such settlement as it, in its sole discretion, shall deem advisable; provided that prior to entering into any settlement which shall impose any obligation upon Licensee, Licensee's consent thereto shall have been obtained, which consent shall not be unreasonably withheld or delayed.

7.5.    Licensee shall not have any claim or cause of action against Licensor arising out of Licensee's promotion, marketing, distribution, or sale of any of the Licensed Products.

7.6.    Licensee expressly acknowledges that this Agreement does not confer any rights upon it to use or employ the Licensed Trademark or other rights granted under this Agreement in connection with any goods, wares, merchandise or services other than the Licensed Products or Materials approved by Licensor, and Licensee shall not use or employ the Licensed Trademark except as expressly authorized herein. Licensee further acknowledges that Licensor is free to use, license or otherwise exploit the Licensed Trademark on any merchandise other than Products within the Territory and on any merchandise outside of the Territory.

7.7    Licensee shall retain ownership of all Improvements developed by it pursuant to the term sheet, including all right, title and interest in and to any and all copyright or patent rights in such Improvements.

## 8. REPRESENTATIONS AND WARRANTIES

8.1.    Each of the Licensee and Licensor represent and warrant to the other that:

(a) it is a corporation duly organized, validly existing and in good standing under the laws of its state of incorporation set forth above and is duly qualified and authorized to do business as a foreign corporation in good standing in all jurisdictions in which the nature of its assets or business requires such qualification;.

(b) it has full right, power and authority to enter into this Agreement and perform all of its obligations hereunder;

(c) its execution, delivery and performance of this Agreement have been duly and properly authorized by all necessary actions and this Agreement constitutes a valid and binding obligation, enforceable against it in accordance with its terms; and

(d) its execution, delivery and performance of this Agreement will not, with or without the giving of notice or passage of time, or both, conflict with, or result in a default or loss of any rights under, any material agreement or understanding to which it is a party or by which it or any of its material properties may be bound.

8.2.    Licensor additionally represents and warrants that it:  (a) owns all right, title and interest in and to the Licensed Trademark with respect to Products in the Territory and has the right to license the Licensed Trademark as contemplated by this Agreement; (b) is not aware of any person or entity that is infringing the Licensed Trademark on Products; (c) is not aware of any person or entity that has rights to the Licensed Trademark that would be infringed by Licensee's use of the Licensed Trademark as licensed hereunder; (d) to the best of its knowledge, the trademark registrations for the Licensed Trademark set forth in Exhibit A hereto are subsisting with respect to footwear and have not been cancelled with respect to footwear; (e) will use



reasonable efforts to maintain the trademark registrations set forth in Exhibit A at its own expense to the extent that the products covered thereby are and remain in continuous use by Licensor, Licensee or another licensee; and (f) the trademarks will be deemed 'intellectual property' as same is defined in § 101(35A) of the United States Bankruptcy Code, 11 U.S.C. § 101 et seq., and that this License Agreement shall be governed by Section 365(n) of the Bankruptcy Code in the event Licensor seeks protection under the Bankruptcy Code or has a case filed against it under the Bankruptcy Code.

8.3.    Licensor covenants that it will maintain the trademark registrations for the Licensed Trademark set forth in Exhibit A hereto to the extent that the goods covered thereby continue to be used in commerce in connection with the Licensed Trademark.

## 9. INSURANCE; INDEMNITY

9.1.    Licensee represents, warrants, and covenants that Licensee and all of the Licensed Products shall be covered, regardless of where or when manufactured, distributed or sold, by comprehensive general liability insurance and comprehensive product liability insurance, in form, coverage and content satisfactory to Licensor. The policies of such insurance shall include a broad form vendor's endorsement specifically naming Licensor as an additional insured, and shall have limits in amounts (and through an insurer) satisfactory to Licensor but which in any event shall have annual limits of no less than $1,000,000 per person and $2,000,000 per occurrence bodily injury coverage and $1,000,000 property damage coverage, and that this Agreement and Licensee's obligations under this Agreement are included in the coverage indicated hereinabove. Not later than fifteen (15) days after the execution of this Agreement and in any event before any manufacture, distribution or sale of any Licensed Products, Licensee shall deliver to Licensor a certificate(s) of insurance indicating coverage in effect as outlined hereinabove. Such certificate(s) shall also include all policy numbers, insurers, expiration dates, and a provision that the coverage will not be canceled without at least thirty (30) days' prior written notice to Licensor.

9.2.    Licensee agrees to indemnify, defend and hold harmless Licensor (including its directors, officers, employees and agents) from and against any and all claims, including but not limited to product liability, wrongful death and negligence claims, suits, liabilities, losses, damages, expenses, including reasonable attorney's fees and related costs caused by, relating to, or incident to the manufacture, packaging, distribution, advertising, sale or use of the Licensed Products, or the breach by Licensee of any of Licensee's obligations hereunder or representations or warranties herein, excepting only claims arising solely from Licensee's use of the Licensed Trademark strictly in accordance with the terms of this Agreement.

9.3.    Licensor agrees to indemnify, defend and hold harmless Licensee (including its directors, officers, employees and agents) from and against any and all claims, suits, liabilities, losses, damages, expenses, including reasonable attorney's fees and related costs arising solely from Licensee's use of the Licensed Trademark strictly in accordance with the terms of this Agreement or a breach of the representations and warranties of Licensor contained herein.

9.4.    In the event of any actions as described in this Section 9, each party will, without charge, furnish to the other such relevant information as is in its possession, execute all necessary



or desirable papers or documents and furnish such other reasonable assistance as may be requested, regardless of whether it shall actively participate in any such action.

9.5.    Notwithstanding the foregoing, neither party shall have the right to seek consequential, special, indirect or punitive damages from the other party.

## 10. TERMINATION

10.1.    In addition to any other rights or remedies that Licensor may have, Licensor shall have the right to terminate this Agreement, including any extension thereof, by providing written notice of termination to Licensee, if:

(a) Licensee does not, within thirty (30) days of receipt of written notice of non-payment, cure any failure to make timely payment of any Sales Royalty or other sum due hereunder or any failure to provide reports or other documents when required, except that there will be no right to cure if Licensee has more than three (3) such delinquent payments or more than three (3) such delinquent reports or documents within any twelve (12) month period;

(b) Licensee materially violates any applicable laws of any government pertaining or relating to the marketing, advertising, promotion, distribution or sale of the Licensed Products;

(c) Licensee becomes insolvent, files a petition for reorganization or bankruptcy or if a receiver or trustee is appointed for its property and business, or if it liquidates its business in any manner whatsoever;

(d) Control or ownership of Licensee is transferred to any person or entity without Licensor's prior written consent or there is a violation of Section 14 below;

(e) Licensee commits or perpetrates any fraud upon Licensor or otherwise in connection with the performance of Licensee's obligations hereunder or if Licensee shall knowingly make a material misrepresentation concerning sales to Licensor; or

(f) Licensee commits any other material breach of its representations, warranties or obligations under this Agreement or permits any breach or default to occur and fails to cure such breach or default within thirty (30) days after written notice thereof from Licensor.

10.2.    In addition to any other rights or remedies that Licensee may have, Licensee shall have the right to terminate this Agreement and all future royalties would be terminated, including any extension thereof, if:

(a) Licensor commits any material breach of its warranties or obligations hereunder or permits any breach or default to occur and fails to cure such breach within thirty (30) days after written notice from Licensee;

(b) The Licensed Trademark is held to be invalid with respect to footwear by a court of competent jurisdiction from which no appeal is available or taken; or

(c) The use of the Licensed Trademark on Products as licensed hereunder is held to infringe the rights of a third party by a court of competent jurisdiction from which no appeal is available or can be taken.

10.3.    Upon the expiration and/or termination of this Agreement for any reason, the right of Licensee to use the Licensed Trademark, the Materials, or any other designation, trade dress, trade name, or copyright belonging to Licensor shall immediately cease, except as to those finished Licensed Products on hand or actually in transit for which non-cancellable orders have been placed as of the effective date of termination. Except as described below, all such items in Licensee's possession or owned by Licensee shall immediately be destroyed and Licensee shall immediately deliver to Licensor affidavits signed by the President of Licensee confirming such destruction. All such items which may have been attached to or made a part of any products or goods in process shall be removed before the merchandise is sold, except where they may have been attached to finished Licensed Products which are sold as provided below. After termination, Licensee will not for any reason manufacture or sell any product which utilizes the Licensed Trademark or which suggests or is intended to suggest or give the impression that it is a product of Licensor, except as provided below.

10.4.    Except if this Agreement is terminated for Licensee's breach of a material term of this Agreement, Licensee shall have nine (9) months after the effective date of termination, cancellation or expiration of this Agreement (the "sell-off period") to dispose of Licensed Products for which non-cancellable orders have been obtained as of such expiration, cancellation or termination, as the case may be, provided Licensee observes all applicable provisions hereof with respect to such sales, including the payment of Sales Royalties.  Except as specifically provided in this Section 10.4, all rights granted hereunder to use the Licensed Trademark shall forthwith revert to Licensor, and Licensor may proceed immediately grant to a third party the rights to manufacture, market, distribute and sell such Licensed Products and otherwise use the Licensed Trademark, and such action by Licensor shall not constitute a breach hereof. At the expiration of the sell-off period, Licensee shall destroy all remaining Licensed Products in inventory and submit to Licensor an affidavit from Licensee's president confirming the destruction of said Licensed Products in inventory.

## 11. NOTICES

All notices provided for in this Agreement and any submissions seeking approval shall be sent by certified or registered prepaid mail or by overnight courier and addressed as follows:



If to Licensor:

> ICB
> 1350 Broadway, Suite 1912
> New York, New York 10018
> Attention: President
>
> with a copy to:
> Martin P. Michael, Esq.
> Sonnenschein Nath & Rosenthal
> 1221 Avenue of the Americas
> New York, NY 10020

If to Licensee:

> Sole City, Inc.
> 141 West 36th St.
> New York, NY 10018
> Attention: President
>
> with a copy to:
> Ronald L. Nurnberg, Esq.
> Kane Kessler PC
> 1350 Avenue of the Americas
> New York, New York 10019

## 12. CONFIDENTIALITY; INJUNCTIVE RELIEF

**12.1.** Neither party will disclose to any third party the other party's confidential business information that is designated "confidential" by the party that is claiming that the information is confidential, except to its attorneys or accountants or as required by law. Licensee agrees that information concerning Licensor's manufacture of Licensed Products, including, without limitation, costs and vendors, is hereby designated "confidential" by Licensor.

**12.2.** Licensee acknowledges and agrees that the breach by Licensee of any of the provisions of Sections 2.3, 2.7, 5.3, 6.1, 7.1, 7.2, 9.1, 12.1 and 13 hereof will irreparably damage Licensor, for which money damages will not be adequate. In the event of such a breach by Licensee, Licensor shall be entitled to preliminarily and permanently enjoin Licensee from violating this Agreement in order to prevent the continuation of such harm and/or obtain money damages insofar as they can be determined. In addition, Licensee shall forfeit its rights to receive payments hereunder. Nothing in this Agreement shall be construed to prohibit Licensor from also pursuing any other remedy available to it, the parties having agreed that all remedies are to be cumulative.

## 13. NON-ASSIGNABILITY

The trademark license granted herein is restricted to use by Licensee and may not be assigned, conveyed (including but not limited to a transfer by merger, consolidation, or purchase of a substantial part of the assets of Licensee or of a controlling interest in the voting stock of Licensee), or sublicensed or subcontracted to, or exercised by, any subsidiary or affiliate of Licensee or any person or entity whatsoever other than Licensee without the express prior written consent of Licensor, which may be granted or denied in Licensor's sole discretion, except in the

7

event of assignment to an affiliated entity that controls, is controlled by or is under common control with Licensee and in the event of such an assignment to such an affiliated entity, Licensee shall remain bound by this Agreement and liable hereunder and shall provide to Licensor a written guarantee signed by Licensee (in form and content satisfactory to Licensor) of the affiliated entity's performance hereunder. This Agreement shall inure to the benefit of and be binding upon the respective successors and permitted assigns of the parties hereto.

### 14. APPLICABLE LAW

The validity, construction and performance of this Agreement shall be governed by, and interpreted in accordance with, the laws of the State of New York, without regard to its conflict of laws principles. Licensor and Licensee agree that any controversy or claims arising out of or in any way relating to this Agreement or the relationship between the parties, whether at common law or under a statute, shall be adjudicated exclusively by either the federal or state courts within New York County, New York. Licensor and Licensee hereby consent to and submit to the jurisdiction of the state and federal courts within New York County, New York and agree that process may be served upon them in any manner provided by the laws of the State of New York.

### 15. GOVERNMENTAL APPROVALS; COMPLIANCE WITH LAWS

**15.1.** Licensee will cooperate fully with Licensor in obtaining all consents and authorizations and making filings, recordings, and registrations to the extent that such may be requisite to the enforceability, effectiveness and performance of this Agreement or to the protection of the Licensed Trademark under the applicable laws of the Territory.

**15.2.** Licensee shall comply with all applicable federal, state and local laws and regulations in Licensee's performance hereunder.

### 16. RESERVATION OF RIGHTS NOT GRANTED

Licensor reserves and retains all rights in and to the Licensed Trademark or otherwise, not specifically granted to Licensee hereunder.

### 17. ENTIRE AGREEMENT; WAIVERS; MODIFICATIONS

This writing contains the entire agreement and understanding of the parties concerning the subject matter hereof, and it terminates, cancels, and supersedes all prior understandings, agreements, promises, representations and the like which relate to the matters set forth herein. Neither party has made any warranties or representations except as expressly set forth herein. No amendment, modification or waiver of any provision of this Agreement shall be effective or binding unless in writing and signed by the duly authorized representatives of both parties. The failure of either party at any time to enforce any provision of this Agreement or to exercise any right shall not be construed to be a waiver of such provision or the right of that party thereafter to enforce such provision.

### 18. SURVIVAL

The provisions of Sections 3.1-3.3, 7.1, 7.3, 7.5, 9.1-9.4, 10.3, 10.4, 12.1, 12.2, 13, 14-17 shall survive the expiration or termination of this Agreement.

C:\My Documents\Troop\Miscellaneous\NYCLIB2-9866291.v5-icknolecityEcagmt - final t-9-02.doc



## EXHIBIT A

### Trademark Registrations for Licensed Trademark

| Country | Trademark | Registration Number |
|---------|-----------|---------------------|
| United States | Troop with Arrow Designs | 1,534,395 |
| United States | Troop | 2,022,078 |



# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------x
                              :

FULL CREATIVE, LTD. d/b/a I.C.B.      :
ASIA, CO., LTD.,                    :       04 Civ. 02907
                              :       (RJH)(GWG)
              Plaintiff,      :

    -  against –                :

SOLE CITY, INC., SOLOMON SAFDEYE,  :
ALAN KANDALL, JEFFREY BERNSTEIN  :
And MARC DOLCE,                :

            Defendants.    :

--------------------------------------------------------x

MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S
<u>THIRD AND FOURTH CLAIMS FOR RELIEF</u>

Of Counsel:
Dana M. Susman

KANE KESSLER, P.C.
1350 Avenue of the Americas
New York, New York 10019
(212) 541-6222

# TABLE OF CONTENTS

Preliminary Statement.................................................................................................................. 1

Statement of Facts...................................................................................................................... 2

Argument ..................................................................................................................................... 5

I.      PLAINTIFF'S CLAIMS FOR FRAUD AND NEGLIGENT
        MISREPRESENTATION MUST BE DISMISSED BECAUSE
        THEY ARE REDUNDANT OF ITS CLAIM FOR BREACH OF CONTRACT ............. 5

Conclusion .................................................................................................................................. 10

#204344.1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

FULL CREATIVE, LTD. d/b/a I.C.B.         :
ASIA, CO., LTD.,                         :        04 Civ. 02907
                                         :        (RJH)(GWG)
               Plaintiff,                :
                                         :
      -   against –                      :
                                         :
SOLE CITY, INC., SOLOMON SAFDEYE,        :
ALAN KANDALL, JEFFREY BERNSTEIN          :
And MARC DOLCE,                          :
                                         :
               Defendants.               :
------------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S
## THIRD AND FOURTH CLAIMS FOR RELIEF

### Preliminary Statement

Defendants Sole City, Inc. ("Sole City"), Solomon Safdeye ("Safdeye") and Alan

Kandall ("Kandall"), (collectively, the "Defendants"), submit this Memorandum of Law in

support of their motion pursuant to F.R.C.P. 12(b)(6) to dismiss the third and fourth claims for

fraud and negligent representation asserted by plaintiff Full Creative, Ltd. d/b/a I.C.B. Asia, Co.,

Ltd. (the "Plaintiff"), and for such other and further relief as the Court deems just, proper and

equitable.

Plaintiffs' claims for fraud and negligent misrepresentation are nothing more than a

"dressed up" contract claim, asserted for the sole purpose of improperly including individual

defendants and extracting punitive damages in this garden variety breach of contract case.

However, the law of this State prohibits Plaintiff from transforming its breach of contract claim

into one for fraud where, as here, the alleged misrepresentations are not collateral to the parties'

#204344.1

agreement, there is no legal duty between the parties other than that created by contract, and no special damages are sought as a result of the alleged misrepresentations. Therefore, even assuming that Plaintiff's allegations are true, its fraud and negligent misrepresentation claims must be dismissed as a matter of law.

### Statement of Facts

Upon a motion to dismiss pursuant to F.R.C.P. 12(b)(6), the Court should accept all well-pleaded factual assertions as true. See, e.g., Gucci America, Inc. v. Duty Free Apparel, Ltd., 277 F.Supp.2d 269, 272 (S.D.N.Y. 2003). The factual allegations relevant to this motion are set forth in the complaint, to which the Court is respectfully referred, and may be summarized briefly as follows.

Plaintiff is a Taiwanese corporation engaged in the business of manufacturing branded footwear. (Complaint at par. 5). Defendant Sole City is a domestic corporation engaged in the business of manufacturing and selling branded footwear to national and regional retailers throughout the United States and Canada. (Complaint at par. 6). Safdeye is the President and sole shareholder of Sole City, and Kandall is the Chief Financial Officer of Sole City. (Complaint at par. 7 and 8).

On or about September 1, 2002, Sole City and an entity known as Innovative Custom Brands, Intl., Inc. ("ICB US") entered into a license agreement (the "License Agreement") whereby ICB US granted to Sole City an exclusive right to use the trademark TROOP in connection with the sale of footwear in the United States. (Complaint at par. 13). Pursuant to Article 2 of the License Agreement, Sole City was required to purchase all goods branded with the TROOP trademark from ICB US or its designee. Although the License Agreement does not

address the issue, Plaintiff alleges that Plaintiff was "ICB US's designee to manufacture all

Licensed Products pursuant to the License Agreement." (Complaint at par. 14).

In paragraph 16 of the Complaint, Plaintiff alleges that "between March and December

2003, Sole City ordered and accepted delivery [from Plaintiff] of approximately 110,000 pairs of

Licensed Product having an invoice value in excess of $1,700,000" and that "[t]o date, Plaintiff

is owed approximately $1,300,000 for Licensed Products ordered and accepted by Sole City,

plus more than $60,000 for sample and production molds Plaintiff manufactured at [Sole City's]

behest."

Based upon the foregoing, as well as Plaintiff's conclusory allegations that Sole City is

the "alter ego" of Safdeye, Plaintiff asserts a first claim for relief against defendants Sole City

and Safdeye for breach of contract in the amount of approximately $1,400,000.

However, in a dubious effort to create another avenue of recovery for the identical

damages, Plaintiff also asserts a third and fourth claim for relief against each of the Defendants

for fraud and negligent misrepresentation, which claims are directly related to and arise from

Sole City's alleged breach of contract.  In support of its causes of action for fraud and

misrepresentation, Plaintiff alleges that from September 2003 through February 2004,

"Defendants made material misrepresentations to Plaintiff concerning Sole City's intent and

ability to make the payments due [under the parties' contract]." (Complaint at par. 67).  The

following alleged misrepresentations form the basis for Plaintiff's fraud and negligent

misrepresentation claims:

-   "Kandall falsely assured [Plaintiff] that Sole City would pay what it owed,
    and told [Plaintiff] that he was working with Sole City's bank to secure
    financing to pay Plaintiff's outstanding invoices." (Complaint at par. 19);

- "Safdeye acknowledged Sole City's debt to Plaintiff and falsely promised [Plaintiff] that Sole City would pay Plaintiff...$200,000 per month until the entire outstanding balance was satisfied." (Complaint at par. 20);

- "Kandall falsely represented to ICB US...that Sole City did not have the necessary funds to make the payments promised by Safdeye." (Complaint at par. 22);

- "Kandall told...[Plaintiff] that Sole City would...use the proceeds of the sale of the [Licensed Products] to make substantial monthly payments to Plaintiff..." (Complaint at par. 24);

- "Safdeye falsely represented that Sole City did not have the money to make the payments proposed by Kandall..." (Complaint at par. 25);

- "Defendants continued throughout the month of December 2003 to present ICB with one fraudulent proposal after another as to how and when the debt to Plaintiff would be paid." (Complaint at par. 26);

- "Bernstein and Kandall again misrepresented to [Plaintiff] that Sole City lacked the funds to pay Plaintiff's invoices, but assured [Plaintiff] that Safdeye was going to pledge one of his two houses as security to finance the payment of Sole City's debt." (Complaint at par. 29);

- "Bernstein and Kandall [represented] that Sole City would begin paying Plaintiff a minimum of $100,000 per month in January 2004." (Complaint at par. 30);

- "Safdeye and Kandall again falsely represented to [Plaintiff] that Sole City lacked the financial wherewithal to make any further payments." (Complaint at par. 30); and

- "Defendants made repeated false promises to pay and repeatedly misrepresented Sole City's financial condition..." (Complaint at par. 34);

Plaintiff further alleges that it relied on the foregoing representations by foregoing action "to collect the outstanding debts" and by continuing "to ship Licensed Products to Sole City." (Complaint at par. 68).[1]

---

[1] However, it is difficult to imagine that Plaintiff "forestalled action to collect the outstanding debts" and "continued to ship Licensed Products to Sole City" based upon Defendants' alleged repeated misrepresentations that Sole City lacked the funds necessary to pay such outstanding debts.

#204344.1                                           4

Accepting as true all of the allegations contained in Plaintiff's complaint, and drawing all inferences in its favor, Plaintiff's claims for fraud and negligent misrepresentation must nonetheless be dismissed as a matter of law.

### Argument

I.    **PLAINTIFF'S CLAIMS FOR FRAUD AND NEGLIGENT MISREPRESENTATION MUST BE DISMISSED BECAUSE THEY ARE REDUNDANT OF ITS CLAIM FOR BREACH OF CONTRACT**

Plaintiff's claims for fraud and negligent representation fail as a matter of law because they are qualitatively equivalent to its breach of contract claim.  It is the well established law of this State that "a cause of action seeking damages for fraud cannot be sustained when the only fraud charged relates to a breach of contract."  A. Lorenzo Barroso, S.A. v. Polymer Research Corp. of America, 80 F.Supp.2d 39, 44 (E.D.N.Y. 1999).  See also, McKernin v. Fanny Farmer Candy Shops, Inc., 176 A.D.2d 233, 234, 574 N.Y.S.2d 58, 59 (2d Dep't 1991) (where a fraud claim "is premised upon an alleged breach of contractual duties…a cause of action sounding in fraud does not lie"); Metropolitan Transp. Auth. v. Triumph Advertising Productions, 116 A.D.2d 526, 527, 497 N.Y.S.2d 673, 675 (1st Dep't 1986) (fraud claim dismissed where claim "alleged only a breach of the representation of performance implicit in [agreement] and a subsequent assurance of performance by the defendant").[2]

Thus, in order to maintain a claim for fraud where a contract exists between the parties, a plaintiff must demonstrate, in addition to the traditional elements of fraud, either: (a) a legal duty separate from the duty to perform under the contract; or (b) a fraudulent misrepresentation collateral or extraneous to the contract; or (c) special damages that are caused by the

---

[2]  "The rationale for this rule is that a party need not be expressing an unconditional intention to perform by contracting, and may instead be expressing an intention either to perform or suffer the ordinary contractual consequences for breach." Vtech Holdings Ltd. v. Lucent Technologies, Inc., 172 F.Supp.2d 435, 439 (S.D.N.Y. 2001) (citations omitted).

misrepresentation and unrecoverable as contract damages. <u>Bridgestone/Firestone, Inc. v.</u>

<u>Recovery Credit Services, Inc.</u>, 98 F.3d 13 (2d Cir. 1996) (citations omitted).   Based upon

<u>Bridgestone</u> and its progeny, Plaintiff has not, and cannot, allege any of the requirements

necessary to sustain its fraud claim.

   In <u>Bridgestone</u>, the plaintiff and defendants entered into a contract whereby defendants

agreed to perform certain collection services on behalf of plaintiff.  In support of its fraud claim,

Plaintiff alleged that after the execution of the contract, defendants misrepresented that they

intended to perform their obligation to turnover all monies collected on behalf of plaintiff and

that defendants transmitted several checks to plaintiff, knowing that there were insufficient funds

on deposit to pay the checks.  Notwithstanding the above, the Court of Appeals vacated a

judgment for plaintiff on the fraud claim, holding that:

> [w]e may assume that these representations were intended to lull plaintiff
> into a false sense of security and that they did so to plaintiff's detriment.
> However, these facts amount to little more than intentionally false
> statements by defendant, indicating his intent to perform under the
> contract.  That is not sufficient to support a claim for fraud under New
> York law.

98 F.3d at 19-20.

   Similarly, in <u>Turnbull v. Kling</u>, 1999 U.S. Dist. LEXIS 13056 (S.D.N.Y. 1999), plaintiff

alleged that he was fraudulently induced into entering into a settlement agreement as a result of

defendant's misrepresentation that defendant's employer was "about to obtain funding that

would permit [defendant's employer] to pay the settlement agreement and that the settlement

agreement would be paid within a matter of weeks."  Defendant's employer subsequently failed

to make any payments required by the settlement agreement, and plaintiff sued defendant for

fraud.  Relying on the general proposition that a contract claim cannot be transformed into a

fraud claim espoused in <u>Bridgestone</u>, the Court dismissed the fraud claim, holding that:

> [t]his is a classic example of a contract claim disguised as fraud…defendant's
> financing representation was simply a promise that [defendant's employer]
> would be in a position to pay plaintiff $50,000 after January 1, 1999…The
> allegation of fraud…is based entirely on [defendant's employer's] failure to
> make payments to plaintiff as required under the Settlement Agreement.  I
> find that the [fraud] [c]laim is nothing more than a breach of contract claim
> against [defendant's employer], and therefore, it cannot properly form the
> basis for a fraud claim against defendant.

1999 U.S. Dist. LEXIS 13056 at 11.

In Beeland Interests, Inc. v. Armstrong, 2000 U.S. Dist. LEXIS 13741 (S.D.N.Y. 2000),

the Court had further occasion to apply the principles set forth in both Bridgestone and Turnbull.

In Beeland, the plaintiff sued defendant for fraud, alleging that subsequent to the parties' contract

to produce a film, defendant misrepresented that it was "not working on anything but the film,"

and that plaintiff relied on such misrepresentations in making advance payments for the film.

The court dismissed plaintiff's fraud claims, holding that:

> [p]laintiff's putative fraud claim here is indistinguishable from the fraud
> claims asserted in Bridgestone/Firestone and Trunbull…
> **Bridgestone/Firestone and Turnbull teaches that a misrepresentation
> concerning the availability of the assets necessary to perform the
> contract does not give rise to a fraud claim…Indeed, if non-disclosure
> of a promisor's post-formation inability, unwillingness or
> disinclination to perform his promise gives rise to a fraud claim, any
> breach of contract claim could be converted into a fraud claim.  Thus,
> even if I assume a duty to disclose these facts, they are not collateral to
> the contract and cannot, therefore, support a claim for fraud.**

2000 U.S. Dist. LEXIS at 7.  (Emphasis added).

More recently, New York federal courts have refused to sustain a fraud claim based upon

alleged misrepresentations concerning a party's willingness or ability to pay a contractual

obligation.  For example, in Frontier-Kemper Constructors, Inc. v. American Rock Salt

Company, 224 F.Supp.2d 520, 531 (W.D.N.Y. 2002) the Court dismissed a fraud claim, holding

that, "[t]he Court is not aware of, nor has plaintiff cited to, a single court decision, from any

jurisdiction, in which a party to a contract negotiation was held liable for fraud because it misrepresented the amount it was willing or able to pay." The Court further held that:

> [t]his is not a claim for fraudulent inducement, since defendant did not make the alleged misrepresentations until after the agreement was signed, nor are the alleged misrepresentations collateral to the agreement...Rather, this is a situation where, after the agreement was signed, the defendant allegedly made fraudulent statements that it was performing the contract, when it had allegedly had breached the contract. In Bridgestone/Firestone, the Second Circuit held that such statements are not sufficient to state a claim for fraud under the law of New York.

224 F.Supp.2d at 537, citing, John Paul Mitchell Systems v. Quality King Distributors, Inc., 2001 U.S. Dist. LEXIS 11587 at 5 (S.D.N.Y. 2001) ("intentionally false statements to conceal a breach of contract do not give rise to an action for fraud").

Here, the same operative facts give rise to Plaintiff's causes of action for breach of contract and fraud, namely, the failure to pay for goods sold and delivered. Defendants' alleged misrepresentations concerning Sole City's intent and ability to perform its obligations under the License Agreement are clearly not extraneous or collateral to that agreement. To the contrary, such representations are directly related to, and are premised upon, Defendants' alleged contractual obligations. Moreover, Plaintiff does not allege that a legal duty exists which is separate from the duty to perform pursuant to the License Agreement. Finally, Plaintiff does not plead or seek special damages as a result of the alleged misrepresentations. Thus, the harm Plaintiff has suffered appears to be the same which it attributes to Defendants' alleged breach of contract.

Under these circumstances, Plaintiff's fraud claims are merely redundant of its contract claims and are not separately cognizable under New York law. See, Ladenburg Thalmann & Co., Inc. v. Imaging Diagnostic Systems, Inc., 176 F.Supp.2d 199 (S.D.N.Y. 2001) (plaintiff's fraud claims dismissed as redundant where "[t]he same operative facts give rise to both causes of

action,…the harm [plaintiff] suffered appears to be the same damages it attributes to the alleged

[breach of contract]"); Log on America, Inc. v. Promethean Asset management L.L.C., 223

F.Supp.2d 435, 450 (S.D.N.Y. 2001) (fraud claims dismissed where "no duty…existed between

[the parties] apart from the duty to perform pursuant to the Agreement,…each of the

misrepresentations…is based upon the…Agreement, [and] [p]laintiffs do not seek special

damages as a result of the alleged misrepresentations"); Macquesten General Contracting, Inc. v.

HCE, Inc., 191 F.Supp.2d 407, 410 (S.D.N.Y. 2002) (fraud claims dismissed where

"[defendant's] duty to pay is firmly rooted in…the agreement and [does not]…arise apart from

the underlying obligations in the operative agreement,…the representations squarely addressed

contractual obligations[, and]  damages for these alleged representations may be

recoverable…through [plaintiff's] breach of contract claim").[3]

---

[3] "The rule concerning fraud also applies in the context of negligent misrepresentation." A. Lorenzo Barroso, S.A. v. Polymer Research Corp. of America, 80 F.Supp.2d 39, 44 (E.D.N.Y. 1999).

#204344.1                                        9

## Conclusion

For all of the foregoing reasons and principles of law, Plaintiff's Third and Fourth Claims for Relief, for fraud and negligent misrepresentation, respectively, must be dismissed, with prejudice.

Respectfully submitted,

KANE KESSLER, P.C.

By: _____

S. Reid Kahn

Attorneys for Defendants Sole City, Inc., Solomon Safdeye and Alan Kandall
1350 Avenue of the Americas
New York, New York 10019
(212) 541-6222

Of Counsel:

Dana M. Susman

*THIS DOCUMENT HAS BEEN FILED ELECTRONICALLY*

#204344.1                                    10

## AFFIDAVIT OF SERVICE BY REGULAR MAIL

STATE OF NEW YORK    )
                                        )ss.:
COUNTY OF NEW YORK  )

I, **Nellya Dym,** being duly sworn, say:

I am not a party to the within action, am over 18 years of age, and reside in Brooklyn, New York.

On May 26, 2004, I served the within:

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S THIRD AND FOURTH CLAIMS FOR RELIEF

by delivering true copies hereof, enclosed in post-paid wrappers, in an official depository under the exclusive care and custody of the U.S. Postal Service within New York State, addressed to each of the following:

*Gursky & Partners, LLP*
   Attorneys for Plaintiff
1350 Broadway, 11th Floor
New York, New York 10018

*Feldman Weistein LLP*
   Attorneys for Defendant Jeffrey Bernstein
420 Lexington Avenue
New York, New York 10170
(212) 869-7000

                                                        _____
                                                        Nellya Dym

Sworn to before me this
26th day of May, 2004.

_____
Notary Public

#204488.1          Arthur M. Rosenberg
                    Notary Public, State of New York
                    No. 02RO4870146
                    Qualified in New York County
                    Commission Expires August 11, 20___